595 A.2d 649

**PRUDENTIAL PROPERTY AND CASUALTY INSURANCE COMPANY and Prudential General Insurance Company, Petitioners,**

v.

**DEPARTMENT OF INSURANCE and Constance B. Foster, Insurance Commissioner, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Feb. 13, 1991.

Decided July 10, 1991.

158

Robert E. Kelly, Jr., for petitioners.

Terrance A. Keating, for respondents.

Before CRAIG, President Judge, and DOYLE, McGINLEY, SMITH, PELLEGRINI, KELLEY and BYER, JJ.

SMITH, Judge.

Prudential Property and Casualty Insurance Company (PRUPAC) and Prudential General Insurance Company (PRUGEN) (collectively, Prudential) petitions for review of an order of the Insurance Commissioner (Commissioner) denying Prudential's request for extraordinary circumstances relief from the private passenger automobile insurance rate reductions mandated by the Act of February 7, 1990, P.L. 11 (Act 6), which amended certain provisions of Titles 18, 42, and 75 of the Pennsylvania Consolidated Statutes. Prudential filed its request for relief pursuant to 75 Pa.C.S. § 1799.7(b)(3), which provides that an insurer aggrieved by the rate rollbacks mandated by Act 6 may seek relief from the Commissioner who is empowered to grant relief if he or she deems the same necessary in extraordinary circumstances. The Commissioner's order is vacated, and this matter is remanded for further proceedings consistent with this opinion.

## I

Act 6 was enacted by the General Assembly in an effort to contain and reduce the rapidly escalating costs of auto-

mobile insurance coverage in the Commonwealth and especially in the City of Philadelphia. *See Keystone Insurance Co. v. Foster*, 732 F.Supp. 36 (E.D.Pa.1990). While the provisions of Act 6 are extensive, the principle cost reduction features are set forth in its amendments to the Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. §§ 1701–1799.7, and in particular Section 1799.7 which requires a rate reduction for an insured choosing a "full tort option" (as described in 75 Pa.C.S. § 1705) of 10% from the applicable premium, and a rate reduction for an insured choosing a "limited tort option" (as described in 75 Pa.C.S. § 1705) of 22% from the applicable premium. The limited tort option is known also as the "verbal threshold." Section 1799.7 requires that all insurers file new private passenger motor vehicle rates reflecting the aforesaid rate reductions by May 1, 1990, which new rates shall become effective on July 1, 1990. Other significant provisions of Act 6 include a ceiling on medical costs, peer review of medical charges, increased protections against insurance fraud, and a lowered minimum first-party coverage from $10,000 to $5,000.

Prudential submitted timely filings to the Pennsylvania Insurance Department (Department) as required by Section 1799.7, reducing its rates by 10.8% for full tort electors and by 22.8% for limited tort electors, the additional reductions owing to Prudential's use of next dollar rounding. Thereafter, on June 28, 1990, Prudential submitted to the Department a filing for extraordinary circumstances relief pursuant to Section 1799.7(b)(3), which states:

> An insurer aggrieved by the rate reductions mandated by this subsection [which concern the aforesaid 10% and 22% rollbacks] may seek relief from the commissioner, which relief may be granted when the commissioner deems necessary in extraordinary circumstances.

Prudential's filing for relief was based, at least in part, upon information issued by the Department that insurers making less than a 12% after-tax rate of return on statutory surplus would be eligible for relief under Section 1799.-7(b)(3); and Prudential calculated that because of the man-

datory rate reductions, its rate of return on surplus would fall below this threshold. O'Brien Direct, pp. 20–21.[1] Prudential requested an 8.6% rate increase. The Department denied Prudential's relief request on July 27, 1990, finding that Prudential would achieve a rate of return on surplus in excess of 12% for the seventeen-month period between February 1, 1990 and June 30, 1991 based upon data supplied to the Department by Prudential.[2] Prudential sought review of the Department's determination, and a referee's hearing was held on September 12 and 13, 1990.

At the hearing, the prefiled direct testimony of the parties' witnesses was submitted into evidence and the witnesses were subjected to cross-examination. Prudential presented the testimony of Robert M. O'Brien, its Director of Pricing; John P. Finn, a Prudential marketing manager and former claims manager; and Jerry W. Rapp, F.A.C.S., who is employed by an actuarial consulting firm. The

**1.** Both the Department and Prudential prefiled the direct testimony of their witnesses prior to the referee's hearing.

**2.** The methodology of the Department in determining extraordinary circumstances relief based upon an insurer's contention that its rates under Act 6 are inadequate involves a two-step process. First, the Department evaluates data supplied by the insurer which affects a seventeen-month period from February 7, 1990 (the date Act 6 was enacted) to June 30, 1991. The data includes projected premiums, estimated underwriting losses, other expenses, and investment income. In evaluating the estimated underwriting losses, the Department considers "loss reduction factors" attributable to Act 6; that is, savings to insurers contemplated by Act 6. The Department applies a tax rate of 34% to the resulting sum obtained from the aforesaid data to obtain an aftertax net income. The Department then multiplies the insurer's premium-to-surplus ratio to the product of premium income divided by net after-tax income to arrive at an after-tax rate of return on statutory surplus. Statutory surplus is that amount of capital surplus required of insurers by the Act of July 9, 1976, P.L. 948, *as amended,* 40 P.S. §§ 1–6701.

If the after-tax rate of return on statutory surplus equals or exceeds 12%, the Department will deny relief on the grounds that the 12% figure exceeds the latest ten-year average rate of return of the property and casualty industry as a whole. If, however, the resulting rate of return falls below 12%, the Department will implement its second step, which is a review of the data over a twelve-month prospective period. The Department will grant relief to the extent that it will allow the insurer to realize a 12% rate of return over that twelve-month prospective period.

Department presented the testimony of James R. Neidermyer, an actuary employed by an insurance consulting firm. Finding from the evidence presented that PRUPAC would earn an after-tax rate of return of 14.25% on surplus and that PRUGEN would earn an after-tax rate of return of 17.31% on surplus, the Commissioner affirmed the Department's denial of Prudential's request for extraordinary circumstances relief.

In its appeal to this Court, Prudential raises the following issues for this Court's consideration:

1. Whether the methodology developed and used by the Commissioner to determine filings for extraordinary circumstances relief constitutes an unpublished regulation because it establishes an inflexible mathematical standard which applies across-the-board to all insurers and which cannot be modified at hearing.

2. Whether the use of the period February [1990]—June [1991] constitutes retroactive ratemaking in violation of the Rate Act and [this] Court's recent *State Farm* decision.

3. Whether the Commissioner erred as a matter of law in failing to accept necessary corrections to the Department's denial of Prudential's extraordinary circumstances request.

4. Whether the Commissioner's wholesale adoption of the Department's Act 6 cost saving analysis is contrary to law, not supported by substantial evidence and not credible.

5. Whether the Commissioner's application of a 'nonconfiscatory' standard for rate regulation, which is lower than a 'fair and reasonable' or 'adequate' standard, is constitutional.

6. Whether the procedures utilized by the Department at the hearing denied Prudential an opportunity for a fair hearing.

This Court's scope of review of these issues is well circumscribed. This Court may not reverse or modify an agency

adjudication unless the adjudication violates constitutional rights, is not in accordance with agency procedure or with applicable law, or unless any finding of fact necessary to support the adjudication is not based upon substantial evidence. 2 Pa.C.S. § 704. An agency's adjudication is not in accordance with law if it represents a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. *Slawek v. State Board of Medical Education & Licensure,* 526 Pa. 316, 586 A.2d 362 (1991). With these principles in mind, this Court shall review Prudential's contentions.

## II

Prudential first contends that the Commissioner's use of a 12%–rate-of-return-on-surplus threshold in evaluating filings for extraordinary circumstances relief constitutes a regulation which the Department had not promulgated in accordance with law. The Regulatory Review Act, Act of June 25, 1982, P.L. 633, *as amended,* 71 P.S. §§ 745.1–745.15, and the Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§ 1102–1602 (formerly, the Commonwealth Documents Law), provide that regulations be promulgated pursuant to a system of public notice, request for comment, public hearing where appropriate, adoption, and review. The Department's 12% threshold was not established by this procedure, but was publicly announced via a Departmental news release dated May 25, 1990. Prudential argues, however, that the threshold, which Prudential contends applies to all insurers, constitutes a substantive rule not subject to challenge or change and is therefore a regulation rather than a mere "statement of policy," as asserted by the Commissioner. An invalid regulation has no controlling effect upon the outcome of a proceeding. *Lopata v. Unemployment Compensation Board of Review,* 507 Pa. 570, 493 A.2d 657 (1985).

The distinction between a regulation and an agency's statement of policy is not always clear. *Pennsylvania Human Relations Commission v. Norristown Area*

*School District,* 473 Pa. 334, 374 A.2d 671 (1977) (*Norristown*). The definitions of "regulation" in both the Regulatory Review Act and the former Commonwealth Documents Law provide little direction on this issue.[3] In *Norristown,* however, the Pennsylvania Supreme Court adopted guidelines first enunciated by the Court of Appeals for the District of Columbia in *Pacific Gas & Electric Co. v. Federal Power Commission,* 164 U.S.App.D.C. 371, 506 F.2d 33 (1974), as follows:

An administrative agency has available two methods for formulating policy that will have the force of law. An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents. A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.

. . . .

The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings. . . . A properly adopted substantive rule establishes a standard of conduct which has the force of law. . . . The underlying policy embodied in the rule is not generally subject to challenge before the agency.

**3.** "Regulation" is defined in relevant part at 71 P.S. § 745.3 as:

Any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency. . . .

The definition of "regulation" set forth at 45 P.S. § 1102(12) is virtually identical.

A general statement of policy, on the other hand, does not establish a 'binding norm'.... A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*Norristown,* 473 Pa. at 349–50, 374 A.2d at 679 (citing *Pacific Gas,* 506 F.2d at 38).

In *Norristown,* the Court reviewed an order of the Pennsylvania Human Relations Commission requiring a public school system to develop and submit a plan to eliminate racial segregation in its schools. The school district contended that the Commission's extensive guidelines for school desegregation were inappropriately applied by the Commission in finding segregation in the subject schools because they constituted an improperly adopted regulation of the agency. The Court found that the Commission's guidelines amounted to a statement of policy which the Commission chose to develop through adjudication, despite a mathematical requirement set forth for each desegregation plan, because these guidelines were applied by the Commission through adjudications on a case-by-case basis.

By contrast, the Supreme Court in *Lopata* found that a formula used by the Unemployment Compensation Board of Review to definitively calculate certain credit weeks was an improperly adopted regulation and thus invalid because it was "completely and unequivocally determinative" of the issue to which it applied, even if there were individual circumstances present which might suggest a different result. *Id.* 507 Pa. at 576, 493 A.2d at 660. *See also Baker v. Department of Public Welfare,* 93 Pa.Commonwealth Ct. 632, 502 A.2d 318 (1985) (criteria which completely and unequivocally establish the requirements for approval of a program exception request constitute a binding rule of law and thus a regulation).

In light of these decisions and considerations, there is no basis for this Court to conclude that the Department's 12% threshold is a regulation. Although Prudential contends

that all insurers must fall below this threshold before extraordinary circumstances relief becomes available, the 12% threshold is not established, nor is there evidence that it is applied, in a way which precludes any adjustment for individual circumstances through adjudication on a case-by-case basis. An insurer is not precluded, in other words, from presenting evidence to the Commissioner which would indicate that the 12% threshold would not be determinative of its particular need for extraordinary circumstances relief. Thus, the Commissioner's discretion is not bound by the 12% threshold; an opportunity for individualized determination is afforded where appropriate. *See Guardian Federal Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp.,* 191 U.S.App.D.C. 135, 589 F.2d 658 (1978) (although the mandatory tone of specifications for audits and auditors will serve to encourage compliance, because there exists an opportunity for individualized determinations under these specifications they constitute statements of policy rather than regulations). In this regard, note is taken of a statement of policy of the Department issued April 20, 1990 which interpreted extraordinary circumstances to mean that an insurer's new rates reflecting the mandated rollbacks would be constitutionally confiscatory, taking into account the following considerations: (1) the insurance company's financial solvency; (2) the adequacy of the rates frozen at the December 1, 1989 level under Act 6; and (3) other special circumstances unique to the insurance company and its particular book of business caused by Act 6. 31 Pa.Code § 68.201(g)(3). Thus, the 12% threshold is not completely and unequivocally determinative of an insurer's eligibility for extraordinary circumstances relief and therefore represents a statement of policy rather than a regulation.

■ As a statement of policy, however, the Department's 12% threshold must be supported by evidence and is subject to challenge. *Norristown.* The Department set forth the basis for the 12% figure in the prefiled direct examination of its expert witness, Mr. Neidermyer:

The Department, in its selection of the rate of return standard, reviewed the property and casualty industry rate of return over a period of time. The industry's average rate of return was considered to be an indicator of a fair rate of return for member firms of that industry. The selected 12% standard exceeds the 10.4% arithmetic average rate earned by the property/casualty insurance industry over the 1979 through 1988 period. The 10.4% rate was based on data reflected in two ISO publications: 'Insurer Profitability: A Long–Term Perspective', April 1987, p. 39 and '1988 Insurer Financial Results', June 1988, p. 7. Since the rate developed in the ISO studies reflects GAAP adjustments, a higher rate was selected to adjust the measure to a return on policyholders' surplus.

Neidermyer Direct, p. 5–1. On cross-examination, however, Mr. Neidermyer was less than certain about the source of the 12% threshold:

Q. In tab 5 or section 5 of your testimony, Mr. Neider-myer, you explain to us the, how we get to this 12 percent return on surplus standard. And just to summarize, I understand that it initially starts with a 10.4 arithmetic average of P & C Carriers over a 10–year period which is then rounded down to 10.2 [sic] and multiplied by 1.2?

A. I believe so, that is my understanding.

Q. When you say it is your understanding, are you saying you are not totally comfortable with it?

A. From the Nationwide, that is the way I understand that it was derived.

Q. Have you ever talked to—who came up with that number, do you know?

A. I am not sure.

Q. And your knowledge of how it was derived is in reading the Nationwide adjudication?

A. Yes. And well, in conversation with, several people in the Department.

Q. But you never talked to the person, whoever it was, who actually came up with this number?

A. No.

. . . .

Q. Now, if we, 10.4, well, the conversion formula is to take the GAAP equity figure, times it by 1.2 to give us a return on statutory surplus?

A. Correct.

Q. 10.4 can be multiplied by 1.2 can it not?

A. Correct.

Q. And that would give us 12.48? Is that right?

A. OK.

Q. Have you given any thought to why 12.48 ... wasn't used as the Department's benchmark given that that would be the accurate transaction of this 10.4 percent figure that was derived from this ISO study apparently?

A. Early on when I was involved with this, it goes back very close to the beginning, I recall the 10.4 was based on actual data from the first report and then the 1988 results actually slipped a bit. And I believe it was my thought that that was the reason the 10 percent was selected and then the 1.2 applied to that.

Q. But I take it your testimony is that you are not real clear that that is what happened?

A. No.

Q. You have this vague recollection?

A. Right.

Q. So other than this vague recollection there is no reason that you know of why the number that the Department calculated to be the average return earned by the property/casualty insurance industry from 1979 through 1988, shouldn't be the 10.4 figure which apparently it was?

A. No.

Q. It simply was rounded down to 10.0?

A. Correct.

. . . .

Q. If you were going to indicate what would be an adequate rate of return on a going basis for a company, P

& C writer today, would you recommend in your professional judgment a 12 percent on statutory surplus?

A. I have not done any studies so that I would feel comfortable with picking a number.

Q. Do you recall testifying in the Liberty Mutual case that you would not be sure if you would accept 12 percent on a going basis as being a fair and adequate rate?

A. I recall.

. . . .

Q. Has anything changed your mind from your testimony in that hearing to today's hearing?

A. No.

N.T., September 12, 1990, pp. 191–96.

Although on redirect examination Mr. Neidermyer testified that he believed that the property and casualty industry's average return on surplus for 1989 was lower than the previous ten-year average, thus serving to reduce the overall average over that time, Mr. Neidermyer never provided, nor did any other witness provide, evidence of a substantial nature upon which the Commissioner could make the following findings of fact necessary to support her order:

65. The historical rates of return for the property and casualty market for the past 10 years indicate an average after-tax statutory rate of return under 12 percent: the ten year historical rate of return for private passenger auto insurance is less than 10 percent.

. . . .

81. The insurance Department's standard of a 12 percent return on surplus for extraordinary circumstances review exceeds (1) the property and casualty industry's 10–year historical average for return on private passenger auto (i.e., under 12 percent), (2) the average rate of return earned for Pennsylvania private passenger auto in 1989. . . .

82. The Insurance Department's use of a 12 percent rate of return is supported by a comparison of earnings levels

attained in comparable industries (Neidermyer Direct at 19).[4]

Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Republic Steel Corp. v. Workmen's Compensation Appeal Board,* 492 Pa. 1, 421 A.2d 1060 (1980); *Baker.* Therefore, appellate review must focus on whether there is rational support in the record, when viewed as a whole, for the agency action. *Republic Steel.* There does not exist sufficient evidence in the record to support the Commissioner's use of an exact threshold of 12% for this proceeding.[5] This is not to say that the Commissioner abused her discretion in focusing upon the average rate of return earned by the industry over the ten-year time frame chosen in order to gauge whether extraordinary circumstances are present in a given case to afford relief. This Court holds only that substantial evidence of record does not exist to support the Commissioner's conclusion of what, exactly, that industry rate is.[6] In this regard, it is especially noted that the two ISO reports, upon which the Department relies in deriving an industry rate of return, were not submitted into evidence; and Mr. Neidermyer's testimony indicates that he was not personally familiar with any data or information which would support the Department's 12% figure. Accordingly, this matter shall be remanded to the Commissioner to take evidence on the issue

4. This Court has been unable to locate a Neidermyer Direct at 19 in the record of these proceedings.

5. Prudential argues in its reply brief to this Court that the threshold should be 13.7% rather than 12% because, Prudential avers, Mr. Neidermyer testified that he would be more comfortable with the higher rate as applied to Prudential. This argument is entirely misleading. Mr. Neidermyer testified that he would choose a rate of 13.7% if the Department's model also used Prudential's actual tax rate of 23%. The Department's model, however, uses a much higher tax rate of 34%; and the record is replete with testimony from Mr. Neidermyer that he was entirely comfortable with the Department's rate of 12%, as applied to Prudential, within the structure of the Department's model.

6. The exact rate is important because it is used as a definitive trigger in the Department's model for Section 1799.7(b)(3) proceedings.

of the appropriate industry rate of return and the threshold rate of return applicable to this proceeding. To define the appropriate scope for remand, however, this Court must address the remaining issues raised by Prudential.

## III

Prudential next argues that the Commissioner's use of the seventeen-month period from February 7, 1990 to June 30, 1991 as a basis for reviewing an insurer's rate of return, and the effect of Act 6 upon that rate of return, constitutes retroactive ratemaking in violation of The Casualty and Surety Rate Regulatory Act, Act of June 11, 1947, P.L. 538, *as amended,* 40 P.S. §§ 1181–1199 (Rate Act), and this Court's decision in *State Farm Mutual Automobile Insurance Co. v. Insurance Department,* 133 Pa.Commonwealth Ct. 644, 577 A.2d 951 (1990). In *State Farm,* this Court held that the Rate Act prohibits the Commissioner from authorizing an increase in premiums under Section 1799.7(b)(3) so that the insurer can recoup from new policyholders losses it sustained because of the Act 6 rate rollbacks for existing and prior policyholders. The increased rates would be excessive to the new policyholders under the Rate Act. Prudential also argues that the Commissioner's use of the aforesaid time frame in which to gauge its eligibility for relief under Section 1799.7(b)(3) violates its due process rights. The Commissioner, however, found that the seventeen-month period was chosen because it can gauge the progressive effects of Act 6 upon an insurer's rate of return. Adjudication, p. 33.

The seventeen-month period is used not for the basis of determining or making rates but only to provide a picture of the past and prospective earnings and loss experiences of an insurer to determine if relief is appropriate on the basis of extraordinary circumstances. This procedure, rather than being violative of, actually comports with the Rate Act. Section 3(a) of the Rate Act provides in relevant part that in making rates:

[d]ue consideration shall be given to past and prospective loss experience ... to past and prospective expenses ... and to all other relevant factors within and outside this Commonwealth.

40 P.S. § 1183(a). Certainly, if there existed no Departmental model for proceedings under Section 1799.7(b)(3), an insurer seeking relief on the basis of extraordinary circumstances would attempt to demonstrate the inadequacy of its rates based upon its experience under Act 6 and its prospects for future returns. The Commissioner's model does nothing more than that.

Further, *State Farm* is factually distinguishable and casts no doubt on the Commissioner's exercise of discretion in using the aforesaid seventeen-month period as a gauge. *State Farm* held that Section 1799.7(d) of Act 6 is facially unconstitutional because it deprives insurers of property in the form of previously deemed rate approvals without due process of law. Nothing close to that situation is present in this case. Moreover, as the seventeen-month period is not used as a basis for adjusting rates if extraordinary circumstances are present, any adjustment of rates does not recoup past losses. As Prudential concedes, the Commissioner adjusts rates where extraordinary circumstances are found on the basis of a twelve-month prospective period. Thus, the Commissioner's use of the seventeen-month period as the perimeter for her review is not contrary to *State Farm*.

Prudential's vaguely stated constitutional claim appears to contain two arguments: (1) that Prudential was deprived of its due process rights in somewhat the same manner as the insurer in *State Farm*, and (2) that the Commissioner's use of different periods (albeit overlapping ones) to adjudge whether Section 1799.7(b)(3) relief is appropriate and then measure any relief required will cause disparate treatment among insurers.[7] There is no basis for Prudential's first

7. Prudential also states in its brief that it is adopting the constitutional arguments raised by other insurers in other Act 6 proceedings now before this Court related to the issues in the present case, although it

argument, as discussed in the preceding paragraph. Prudential's second argument is made without evidence in support or any reasoning which would lead this Court to conclude that those insurers granted extraordinary circumstances relief by the Commissioner would enjoy a rate of return greater than the industry average (*i.e.*, 12% if that is the appropriate rate). *See* Adjudication, p. 34. Accordingly, Prudential's constitutional challenge to the Commissioner's use of the seventeen-month period is without merit.

## IV

Prudential next argues that the Commissioner erred by failing to adjust certain calculations used to arrive at Prudential's rate of return on surplus which, if such adjustment were made, would have the effect of reducing Prudential's rate of return. In particular, Prudential argues that:

1. The Commissioner erred by failing to adjust Prudential's premium trend period for physical damage coverages as she had done for the insurer in *In re: Harleysville Mutual Insurance Company and Huron Insurance Company*, Docket No. R90–05–44, filed August 17, 1990 (*Harleysville*). Prudential contends that such adjustment will result in a reduction of anticipated rate of return by .54%.

2. The Commissioner erred by failing to adjust Prudential's earned premium figures to recognize its actual Act 6 rate reduction of 16.8% as opposed to the statutory minimum 16% reduction used by the Commissioner. Prudential contends that such adjustment will result in a reduction of anticipated rate of return by .94%.

does not state with any particularity what those constitutional arguments are. This assertion ignores, among other things, this Court's proscription against addressing issues not preserved by the parties in the foregoing proceedings, and undoubtedly the page limitations for briefs set forth in the Pennsylvania Rules of Appellate Procedure as well. If Prudential felt uncompelled to properly raise an issue before this Court, let alone identify it, nothing more need be said on this subject.

3. The Commissioner erred by using a premium to surplus ratio of 2.53 to 1, reflecting Prudential's 1989 experience, instead of the industry benchmark of 2.0 to 1 or Prudential's five-year average of 2.3 to 1. Prudential contends that by using the latter ratios, the anticipated rate of return will be reduced by either 1.95% or .84% respectively.

### 1. Premium Trend Period.

■ In *Harleysville,* the Commissioner adopted the following unchallenged testimony submitted on behalf of the insurer:

> [P]olicy month losses must be trended three months past the effective date in order to reflect the average date of the loss for the policy period. Premium trend on the other hand, goes only to the point in time that the premium is written. Premium trend reflects only the impact of rating later and later model year cars which have higher physical damage rates. This trend no longer affects the premium after the premium is written.

*Id.,* slip op. at 32–33. The Commissioner, however, applied a premium trend for physical damage to Prudential three months beyond the average written day, or a total of ten and one-half months from July 1, 1989 to May 15, 1990.[8] In her adjudication, the Commissioner noted that a three month trend was applied because Prudential writes six-month policies, giving it an average earned date three months after the written date. Adjudication, p. 30. In their brief opposing Prudential's petition for review, how-

---

**8.** The Commissioner explains the trending process applied in this case as follows:

> [T]he 1989 accident year is used as the basis for [the Department's] seventeen month review period of the [sic] February, 1990 through July, 1991. The midpoint of the 1989 experience period is July 1, 1989. Since earned premium is used to develop the 1989 loss ratio, July 1 is the midpoint of *earned premium,* i.e., the 'average earned date.' Using February 1990 policy month as an example of the trending process in the model, the average *written* day is February 15, 1990. Since Prudential writes six month policies, the average earned date is May 15, 1990, three months beyond the written date.

Adjudication, p. 30 (emphasis in original).

ever, the Commissioner and the Department state that the only distinction between the present case and *Harleysville* is that the insurer in *Harleysville,* unlike Prudential, presented evidence supporting its argument that the premium trend should be adjusted and that the Department did not challenge this evidence. In essence, the Commissioner and the Department argue that Prudential failed to sustain its burden of proof in the face of the Department's evidence concerning the appropriate premium trend.

■ It has long been recognized that this Court may not substitute its judgment for that of an administrative agency acting within its discretion in the field of its expertise upon substantial evidence presented before it; nor will this Court inquire into the wisdom of such action or into the details of the manner adopted to carry this action into execution. *Insurance Department v. Pennsylvania Coal Mining Ass'n,* 26 Pa.Commonwealth Ct. 348, 363 A.2d 823 (1976). This Court also recognizes the technical, complex, inexact, and arcane nature of insurance rate issues, which are to a large extent entrusted to the discretion of the expertise of the Commissioner. *Id.* In this particular instance, however, there is the appearance of an arbitrary use of that discretion, which this Court is empowered to review. *Id.; Slawek.*

The Commissioner's adoption of the testimony in *Harleysville* is not facially conditioned upon the writing practice of the insurer: it states simply that premium trends for physical damage are to the date written. The Commissioner and the Department do not defend using a premium trend beyond the written date in the present matter because there is a distinction in the circumstances which existed in *Harleysville,* but because Prudential did not present unopposed evidence which would set the premium trend to the written date.[9] Although the Commissioner articulated a basis in

**9.** Mr. Rapp's direct testimony, however, includes the following: "I also disagree with the premium trend period factors used in the [Department's] model. I believe it would be more appropriate to trend to the middle of the policy period rather than 3 months past this

her Adjudication for the premium trend she used in this matter, it is unclear from the record whether that premium trend is appropriate in light of the Commissioner's other statements in *Harleysville*. Accordingly, this issue shall be remanded to the Commissioner to further explain and provide support for the apparent discrepancy between this case and *Harleysville* with regard to premium trends.

2. Adjustment of earned premium figure.

There is no dispute that Prudential reduced its premiums by 16.8% instead of the minimum 16% required by Act 6,[10] and the same was found as a fact by the Commissioner. Adjudication, p. 31. In its calculations for Section 1799.-7(b)(3) relief, however, the Department used the 16% figure. The Commissioner found that even had the 16.8% figure been used, Prudential would still have had a rate of return in excess of 12%. The Department argues before this Court only that the record does not provide evidence of the impact of using the 16.8% premium reduction in the Department's calculations. The Department does not, however, dispute the correctness of the figure, and there does not appear to be anything in dispute as far as this issue goes. Any recalculations to be made on remand will incorporate the figure of 16.8% rather than 16%.

3. Premium to surplus ratio.

█ In her adjudication, the Commissioner applied a premium to surplus ratio for Prudential of 2.53 to 1, which was derived from Prudential's 1990 Annual Report submitted to the Department setting forth this figure as its 1989 premium to surplus ratio. Prudential urges that the more appropriate ratio would be 2.3 to 1, reflecting Prudential's most recent five-year average, or 2.0 to 1, which is the industry's target ratio. Prudential contends that the 1989 ratio is an aberration because of losses suffered from Hurricane Hugo

date as the Department has done." Rapp Direct, p. 45. While this is hardly strong testimony, it does indicate that Prudential addressed the issue.

**10.** These figures represent the average of the rate reductions for full tort and limited tort electors (*i.e.*, 16% is the average of 10% and 22%).

and the San Francisco earthquake, and that had a more appropriate ratio been used, Prudential's rate of return would have been reduced below the 12% threshold level.[11]

Prudential, however, never presented evidence concerning its losses from those catastrophes or whether such losses did in fact affect its 1989 ratio, except evidence unspecific to Prudential that large losses from such catastrophes could temporarily increase an insurer's premium to surplus ratio. Further, Prudential does not advance evidence to demonstrate that the Commissioner arbitrarily or capriciously determined that it was reasonable to use Prudential's most recent average premium to surplus ratio (i.e., that set forth in its 1990 annual report). In fact, there is no evidence in the record which indicates that it is more appropriate to use a five-year average ratio or the industry's ideal ratio instead of the insurer's most recent experience. On the contrary, there is testimony in the record that use of the 2.53 to 1 ratio is actuarially appropriate and reasonable in this instance. N.T., September 12, 1990, p. 230. Accordingly, this Court finds no basis to conclude that the Commissioner abused her discretion in applying a premium to surplus ratio of 2.53 to 1 in the present proceedings.

## V

Prudential argues in a rather wholesale manner that the Commissioner committed an error of law and made findings not supported by substantial evidence by adopting the cost savings from Act 6 advanced by the Department (loss reduction factors) and by rejecting nearly every loss reduction factor advanced by Prudential, which generally are not as high as the Department's. Prudential contends, without providing any authority for the proposition, that the Commissioner erred as a matter of law by adopting the Department's loss reduction factors because they are based on "legally incorrect predicates." A review of Prudential's

---

11. Prudential contends that its rate of return would have been reduced by .84% by using the 2.3 to 1 ratio or by 1.95% by using the 2.0 to 1 ratio.

argument, however, indicates that Prudential is simply arguing that its loss reduction factors should have been adopted instead of the Department's, though evidence was provided for both.

■ In essence, Prudential argues that its witnesses are more credible than the Department's Mr. Neidermyer. This determination, however, is of course for the Commissioner to make, along with the weighing of the evidence presented. *See Feldbauer v. Department of Public Welfare,* 106 Pa.Commonwealth Ct. 87, 525 A.2d 837 (1987) (it is the fact finder's duty and not this Court's to judge the weight and credibility of evidence, and the fact finder is not required to accept the testimony of any witness). Therefore, this Court may not disturb the Commissioner's findings if they are supported by substantial evidence in the record regardless of arguments made by a party that its array of witnesses is more impressive than its opponent's. *See Republic Steel.*

■ Prudential, however, cites only two specific instances where it believes the Commissioner erred in adopting the Department's evidence and analysis concerning loss reduction factors rather than Prudential's.[12] First, Prudential argues that the Commissioner incorrectly construed the Medicare and Medicaid laws by failing to recognize that Medicare and Medicaid programs are excess to automobile insurance and provide for rights of subrogation pursuant to 42 U.S.C. § 1395y(b)(2)(B) and 42 C.F.R. §§ 405.323–405.324 (concerning Medicare), and 42 U.S.C. § 1396k(a)(1)(A) and Section 1409 of the Act of June 13, 1967, P.L. 31, *as*

---

**12.** Prudential states in two footnotes, however, that it is adopting and incorporating into its argument the challenges made to the Department's evidence and the Commissioner's findings by other insurers in other adjudications now on appeal to this Court. Prudential names two appeals but states that it is also incorporating the arguments set forth in "others." Further, Prudential does not state either with specificity or generality what any of these alleged arguments are. Suffice it to say, that if Prudential deemed any challenge to the Commissioner's findings in *this* matter important enough for this Court's review, it should have stated and argued such challenge. This Court will not address in this proceeding challenges made by other parties to evidence presented in other cases. *See* footnote 6.

*amended,* 62 P.S. § 1409 (concerning Medicaid and Medical Assistance). The record, however, indicates that the Department's formula, utilized by the Commissioner, considers the effect of Medicaid reimbursement and Medicare subrogation in arriving at Prudential's anticipated rate of return. Neidermyer Direct, pp. 7-2, 7-4, and 7-6; N.T., September 12, 1990, p. 227. *See also* Commissioner's Findings of Fact No. 47.

Second, Prudential argues that the Commissioner erred by failing to take into account the potential effect of a Michigan Supreme Court decision, *DiFranco v. Pickard,* 427 Mich. 32, 398 N.W.2d 896 (1986), upon cost savings attendant with the limited tort option. Michigan had adopted an automobile insurance law similar to Act 6 effective in 1973. *DiFranco,* interpreting Michigan law, held that in construing the limited tort option provisions the issue of whether a plaintiff has suffered a "serious impairment of body function" rests with the jury, and further that an impairment of body function may focus upon a specific part of the body if it constitutes an important body function. Prudential contends that this decision will act as precedent in Pennsylvania and will serve to curtail the cost savings contemplated by the limited tort option provisions of Act 6. The record and the Commissioner's adjudication demonstrate, however, that the effect of *DiFranco* was considered and factored into the Department's model as adopted by the Commissioner. *See* Neidermyer Direct, p. 7-8; Adjudication, p. 40. Further, the Commissioner found that despite *DiFranco,* costs to insurers in Michigan have been lowered because of Michigan's verbal threshold for over ten years, and therefore she determined that it would be unlikely for Act 6's verbal threshold to be immediately eroded through litigation based upon *DiFranco.* There is nothing in the record which would compel this Court to conclude that the Commissioner abused her discretion by failing to accept Prudential's prognostication as to the effect of *DiFranco* in this Commonwealth in the present extraordinary circumstances relief proceeding.

■ Finally, Prudential argues that the Commissioner's adjudication is invalid because she allegedly based her findings on her right as a "regulator" rather than on the evidence presented by the witnesses. Prudential grounds this argument on a misreading or mischaracterization of the penultimate section of the adjudication, which is short enough to quote in its entirety:

Throughout the briefs and reply briefs of the parties, efforts are made to belittle the opinions of each other's expert witnesses. The Commissioner finds the academic credentials and experience of Mr. Rapp and Mr. Neidermyer to be more than adequate and that both of these gentlemen were properly considered expert witnesses.

The Commissioner has not based her findings in this adjudication on the qualifications of the experts who promoted or disputed certain positions on rate of return, loss cost factors and other issues. The Commissioner has considered and weighed the experts' opinions but is not bound to accept an opinion offered by an expert if *based on the record and in her judgment as a regulator charged with enforcing Act 6,* another equally valid interpretation is more reasonable.

Adjudication, pp. 64–65 (emphasis added). This Court does not read this passage to mean that the Commissioner is eschewing the evidence presented by the parties' witnesses, only that she is not bound by the opinions of the witnesses if the record supports another interpretation of the data or evidence. It is axiomatic that the Commissioner, as the fact finder, may accept or reject the testimony or opinion of any witness. *See Feldbauer.* Further, a reading of the Commissioner's adjudication makes it abundantly clear that the Commissioner's findings of fact and discussion are based upon the evidence set forth in the record. The adjudication is replete with citations to the record, and the Commissioner's analyses on the various issues before her attempt to draw reasonable conclusions from the evidence. Therefore, this Court finds no basis to Prudential's argument.

Prudential further asserts that the Commissioner's credibility and bias are in question because she gave more credence to Mr. Neidermyer's analysis of Prudential's projected rate of return under Act 6 rather than Prudential's two "independent" analyses presented by its witnesses. The Commissioner's adjudication, however, deals with the evidence set forth by both parties and explains why the Department's analysis was found to be more reasonable.

## VI

 Prudential next argues that the Commissioner erred by applying a rate of return that is "nonconfiscatory" rather than one that is "fair and adequate." Prudential contends that the latter rate of return is mandated by the U.S. Constitution. This argument is merely one of semantics, however, as Prudential's contentions are centered only upon the Commissioner's characterization of the 12% rate of return as "nonconfiscatory" instead of "fair and adequate." Prudential does not address the issue of whether the actual rate applied, based upon the experience of the insurance industry over the past ten years, is unconstitutional.

The standards for whether a rate violates the Takings Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution are summarized in *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 307–08, 109 S.Ct. 609, 615–16, 102 L.Ed.2d 646 (1989), *aff'g Barasch v. Pennsylvania Public Utility Commission,* 516 Pa. 142, 532 A.2d 325 (1987):

The guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory. Covington & Lexington Turnpike Road Co. v Sandford, 164 US 578, 597, 41 L Ed 560, 17 S Ct 198 (1896) (A rate is too low if it is 'so unjust as to destroy the value of [the] property for all the purposes for which it was acquired,' and in so doing 'practically deprive[s] the owner of property without due process of law'); FPC v Natural Gas Pipeline Co. 315 US 575, 585, 86 L Ed 1037, 62 S Ct 736 (1942) ('By long standing usage in the field of

rate regulation, the "lowest reasonable rate" is one which is not confiscatory in the constitutional sense'); FPC v. Texaco Inc. 417 US 380, 391–392, 41 L Ed 2d 141, 94 S Ct 2315 (1974) ('All that is protected against, in a constitutional sense, is that the rates fixed by the Commission be higher than a confiscatory level'). If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation. . . .

Recently, this Court held that insurers are "entitled to a fair and adequate rate of return, *i.e.*, one which is not confiscatory" under Act 6, thus recognizing the standards enunciated in *Duquesne Light*. *Ohio Casualty Insurance Co. v. Insurance Department*, 137 Pa.Commonwealth Ct. 299, 308–309, 585 A.2d 1160, 1164 (1991).

Therefore, the Commissioner is correct insofar as the Constitution requires only that rates be nonconfiscatory, although it also is true that nonconfiscatory rates may be characterized as fair and adequate.[13] The important issue, however, is not the name placed upon the rate, nor the methodology used to attain it, but the impact of the rate upon the insurer. *See Duquesne Light*, 488 U.S. at 310, 109 S.Ct. at 617 (quoting *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944)) (" 'If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry . . . is at an end.' "). In the present case, the Commissioner applied a rate standard that reflected the property and casualty insurance industry's average experience over a period of ten years.[14] Certainly, if an insurer was achieving this rate of return under Act 6 it can hardly be called confiscatory, or less than fair and adequate, unless the rates received by

**13.** In her adjudication, the Commissioner drew a distinction between nonconfiscatory rates and *statutory* fair and adequate rates. It appears that the statute she is referring to is the Rate Act, and thus she draws a distinction between proceedings under Act 6 and those under the Rate Act, which prohibits rates that are "excessive, inadequate or unfairly discriminatory." *40 P.S. § 1183(d)*.

**14.** That the exact rate still requires determination on remand is immaterial to this discussion.

insurers during the last ten years were on the average confiscatory. Not surprisingly, the record contains no evidence that they were.

Prudential presented evidence at the hearing that a fair rate of return would be approximately 19.2%, which Mr. Rapp testified reflected the rate of return of regulated public utilities and average American industries. The Commissioner, of course, was free to reject this unsupported testimony and did so, noting that Prudential never proffered evidence that it ever achieved such a high rate of return. Adjudication, p. 20. This Court finds no abuse of discretion or constitutional error in the Commissioner's logical adoption of a rate of return reflective of the property and casualty insurance industry's experience rather than one reflective of other industries. Accordingly, this Court finds no merit in Prudential's contention.

Prudential further argues that Section 1799.-7(b)(3) must be unconstitutional unless extraordinary circumstances relief proceedings are governed by the guidelines of the Rate Act. Otherwise, Prudential contends, the Commissioner is clothed with unbridled discretion in granting relief under Section 1799.7(b)(3) amounting to an unconstitutional delegation of legislative power. This argument, however, was not made before the Commissioner and is therefore waived. *See Pennsylvania National Mutual Casualty Insurance Co. v. Insurance Commissioner of Commonwealth of Pennsylvania*, 121 Pa.Commonwealth Ct. 618, 551 A.2d 368 (1988), *appeal denied*, 522 Pa. 581,559 A.2d 41 (1989). To the extent, however, that Prudential's argument is reviewable by this Court pursuant to Pa.R.A.P. 1551(a)(1), which enables a court to review questions involving the validity of a statute though the question was not previously raised before the governmental unit, the following discussion demonstrates that Prudential's argument is meritless.

To determine whether an unconstitutional delegation of legislative power has been made, this Court refers to the

guidelines set forth in *Dauphin Deposit Trust Co. v. Myers,* 388 Pa. 444, 449, 130 A.2d 686, 688–89 (1957):

Where the standard fixed by the Legislature is not arbitrary or unlimited, but is definite and reasonable, the delegation of power or discretion will be sustained as constitutional. In considering the standard, regard must be had to the purpose and scope of the [legislation], the subject matters covered therein, the duties prescribed and the broad and narrow powers granted, because those factors will often determine whether or not a sufficiently clear, definite and reasonable standard has been established. A grant of power to the Department of Banking to approve or disapprove a merger in its sole discretion, without any standards whatever, would be an illegal delegation of authority and would render [such legislation] unconstitutional.

*See also Chartiers Valley Joint Schools v. Allegheny County Board of School Directors,* 418 Pa. 520, 211 A.2d 487 (1965). This Court has held that a legislative delegation of broad discretionary authority to the Insurance Commissioner in approving rate proposals is constitutionally valid when the Commissioner must exercise his or her discretion under the standards of "equitable," "impartial," "inadequate," or "discriminatory" considerations. *Pennsylvania State Ass'n of Township Supervisors v. Insurance Department,* 50 Pa.Commonwealth Ct. 204, 412 A.2d 675 (1980). Accordingly, an unconstitutional delegation of legislative authority has not been made in this case. Act 6 requires that property and casualty insurers roll back their automobile insurance rates as fixed by the legislature.

The Act authorizes the Commissioner to grant relief from these rate reductions, not in the Commissioner's sole discretion, but only in "extraordinary circumstances." This is a definite and reasonable standard, fully in conformity with the requirements of *Dauphin Deposit Trust, Chartiers Valley,* and *Pennsylvania State Ass'n of Township Supervisors.* Moreover, this Court discerns no merit in a contention that a provision granting extraordinary circumstances

relief from rates mandated by the legislature would constitute the equivalent of granting an insurer a brand new rate hearing.[15] *See also Ohio Casualty Insurance.*

## VII

 Finally, Prudential argues that it was denied its constitutional and statutory rights to a fair hearing because the Department's sole witness demonstrated an unfamiliarity with sources for some portions of the Department's model. Prudential, however, failed to raise this issue before the Commissioner, and it is therefore waived. *Pennsylvania National.*[16] In its reply brief to this Court, however, Prudential argues that it raised Mr. Neidermyer's flaws before the Commissioner. This is not the same as arguing that Prudential was unconstitutionally and administratively deprived of a fair hearing, only that Mr. Neidermyer's testimony failed to establish substantial evidence in support of the Department's position. In any event, flaws in an expert witness' testimony generally go only to the weight to be accorded the testimony, not its admissibility. *Pittsburgh Outdoor Advertising Corp. Appeal,* 440 Pa. 321, 272 A.2d 163 (1970); *Bolus v. United Penn Bank,* 363 Pa.Superior Ct. 247, 525 A.2d 1215 (1987), *appeal denied,* 518 Pa. 627, 541 A.2d 1138 (1988). Thus, the right to meaningful cross-examination is not abridged where an expert's testimony contains such flaws. *United States v. Bastanipour,* 697 F.2d 170 (7th Cir.1982), *cert. denied,* 460 U.S. 1091, 103 S.Ct. 1790, 76 L.Ed.2d 358 (1983). *See also Delaware v. Fensterer,* 474 U.S. 15, 106 S.Ct. 292, 88

**15.** Prudential also attempts to incorporate unspecified constitutional claims made by other insurers in other pending Act 6 cases. Again, this Court will not address issues proceeding unless raised by the petitioner and preserved below.

**16.** Moreover, Section 138 of the General Rules of Administrative Practice and Procedure, 1 Pa.Code § 35.138, provides with regard to prefiled direct testimony:
> Written testimony of an expert witness may be received ... where properly supported by the oral testimony of its author on direct examination, subject to cross-examination and motions to strike.

Prudential never filed a motion to strike the testimony.

L.Ed.2d 15 (1985) (the Confrontation Clause of the U.S. Constitution only guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent a party may wish). Prudential further argues that the hearing was "an empty process with a pre-ordained result." Prudential Brief, p. 65. The record, however, does not support this assertion, particularly in view of the extent of the pre-hearing discovery activity involved in these proceedings.

\* \* \*

For the foregoing reasons, the order of the Commissioner is vacated; and this matter is remanded for the Commissioner to consider and take evidence, where necessary, on the issue of the appropriate threshold rate of return and to further explain and support her use of the premium trend period for physical damage coverages applied in this matter. Further, Prudential's rate of return shall be recalculated using Prudential's actual percentage of rate reduction, *i.e.*, 16.8%.

McGINLEY, J., dissents.

PELLEGRINI, J., dissents as to Part VII only.

BYER, J., concurs in result only in Parts II through VI and dissents as to Part VII.

## ORDER

AND NOW, this 10th day of July, 1991, the order of the Insurance Commissioner in this matter, dated November 8, 1990, is hereby vacated, and this case is remanded to the Insurance Commissioner to take additional evidence where necessary and thereafter to make specific findings of fact, conclusions of law, and a final adjudication not inconsistent with the attached opinion.

Jurisdiction relinquished.