**PPL ENERGYPLUS, LLC, Petitioner,**

v.

**COMMONWEALTH of Pennsylvania, Respondent.**

**Delmarva Power & Light Company t/a Conectiv Energy, Petitioner,**

v.

**Commonwealth of Pennsylvania and Pennsylvania Public Utility Commission, Respondents.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Nov. 22, 2002.

Decided Jan. 10, 2003.

John H. Isom, Harrisburg, for petitioner, PPL EnergyPlus, LLC.

Craig A. Doll, Hummelstown, for petitioner, Delmarva Power & Light Co.

Lawrence F. Barth, Harrisburg, for respondent.

BEFORE: FRIEDMAN, Judge, SIMPSON, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge FRIEDMAN.

The Commonwealth of Pennsylvania and the Pennsylvania Public Utility Commission (together, PUC) have filed an application for summary relief (Application) in connection with two petitions for review, one filed by PPL Energyplus, LLC (PPL) and one filed by Delmarva Power & Light Company t/a Conectiv Energy (Conectiv). We grant the Application.

In their respective petitions for review, PPL and Conectiv (together, Petitioners) challenge the PUC's decision to assess Petitioners their share of the cost of administering "public utilities" under section 510 of the Public Utility Code (Code), 66 Pa. C.S. § 510. Petitioners argue that they are "electric generation suppliers" (EGS), not "public utilities," and, therefore, they are not subject to the regulatory assessment. Petitioners argue in the alternative that the PUC erred in grouping EGS companies with electric distribution companies for purposes of the assessment.

Previously in this case, PPL filed an application for summary relief, which this court denied in *PPL Energyplus, LLC v. Commonwealth*, 800 A.2d 360 (Pa.Cmwlth. 2002). This court held that: (1) pursuant to section 102 of the Code,[1] an EGS company is a "public utility" for the limited purposes described in sections 2809 and 2810 of the Code;[2] (2) section 2809(e) of the Code gives the PUC discretion to apply the requirements of the Code to EGS companies in order to ensure that the present quality of the service provided by

---

**1.** 66 Pa.C.S. § 102.

**2.** 66 Pa.C.S. §§ 2809 and 2810.

electric utilities does not deteriorate; and (3) the PUC did not err in grouping EGS companies with electric distribution companies for purposes of the assessment. *Id.*

Having prevailed with respect to PPL's application for summary relief, the PUC now has filed its own Application. The PUC argues that, because this court's decision in *PPL Energyplus* resolves the only issues presented by Petitioners in their petitions for review, the PUC is entitled to summary relief. In opposition, Conectiv argues that this court did *not* resolve all of the questions presented in Conectiv's petition for review. Specifically, Conectiv maintains that this court did not consider Conectiv's argument that the legislature's delegation of authority to the PUC to apply the Code to EGS companies is without guidelines and is, therefore, unconstitutional.[3] Conectiv is correct that we did not consider this question in *PPL Energyplus.* Thus, we shall consider the matter here.

 A presumption exists that the legislature does not intend an unconstitutional result. Section 1922(3) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922(3). Thus, a party arguing the unconstitutionality of a legislative enactment has a heavy burden to sustain the claim. *James v. Southeastern Pennsylvania Transportation Authority,* 505 Pa. 137, 477 A.2d 1302 (1984). To determine whether an unconstitutional delegation of legislative power has been made in a particular case, this court will consider the following rule of law:

> Where the standard fixed by the Legislature is not arbitrary or unlimited, but is definite and reasonable, the delegation of power or discretion will be sustained as constitutional. In considering the standard, regard must be had to [1] the purpose and [2] scope of the [legislation], [3] the subject matters covered therein, [4] the duties prescribed and [5] the broad and narrow powers granted, because those factors will often determine whether or not a sufficiently clear, definite and reasonable standard has been established. A grant of power ... without any standards whatever, would be an illegal delegation of authority and would render [such legislation] unconstitutional.

*Prudential Property and Casualty Insurance Company v. Department of Insurance,* 141 Pa.Cmwlth. 156, 595 A.2d 649, 663–64 (1991) (quoting *Dauphin Deposit Trust Co. v. Myers,* 388 Pa. 444, 449, 130 A.2d 686, 688–89 (1957)).

The purpose of the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa.C.S. §§ 2801–2812, is set forth in section 2802(12) of the Code as follows:

> (12) The purpose of this chapter [Chapter 28] is to modify existing legislation and regulations and to *establish standards* and procedures in order *to create direct access by retail customers to the competitive market for the generation of electricity while maintaining the safety and reliability of the electric system for all parties.* Reliable electric service is of the utmost importance to the health, safety and welfare of the citizens of the Commonwealth. Electric industry restructuring should ensure the reliability of the interconnected electric system by maintaining the efficiency of the transmission and distribution system.

66 Pa.C.S. § 2802(12) (emphasis added). Thus, one purpose of the Competition Act is to establish standards for maintaining

---

**3.** PPL simply asks this court to reconsider its decision in *PPL Energyplus, LLC,* which we decline to do.

safe and reliable electric service in a competitive market that involves EGS companies.

The scope of the Competition Act includes some PUC regulation of EGS companies, and the subject matter of the Competition Act includes EGS licenses, financial responsibility and other matters necessary for the protection of the public, as stated in section 2802(14) of the Code:

> (14) ... The generation of electricity will no longer be regulated as a public utility function *except as otherwise provided for in this chapter*. Electric generation suppliers [EGS companies] will be required to [1] obtain licenses, [2] demonstrate financial responsibility and [3] comply with such *other requirements concerning service as the [PUC] deems*

*necessary for the protection of the public.*

66 Pa.C.S. § 2802(14) (emphasis added). Section 2809(b) of the Code, which governs the PUC's powers and duties with respect to EGS licenses, states that the PUC shall issue a license only to applicants who are "fit, willing and able" to provide EGS service in conformance with established standards and consistent with public policy.[4] Section 2809(c) of the Code, which governs the PUC's powers and duties with respect to EGS financial responsibility, states that, to ensure the safety and reliability of electricity generation, the PUC shall require an EGS company to furnish a bond or other security and certify the payment of taxes.[5]

Section 2802(14) of the Code gives the PUC powers and duties to impose other

---

4. Section 2809(a) of the Code states that no person or corporation shall engage in the business of an EGS unless the person or corporation holds a license issued by the PUC. 66 Pa.C.S. § 2809(a). Section 2809(b) of the Code provides as follows:

> (b) License application and issuance.—An application for an [EGS] license must be made to the [PUC] in writing, be verified by oath or affirmation and be in such form and contain such information as the [PUC] may by its regulations require. A license shall be issued to any qualified applicant, authorizing the whole or any part of the service covered by the application, *if it is found that the applicant is fit, willing and able to perform properly the service proposed and to conform to the provisions of this title and the lawful orders and regulations of the [PUC] under this title, including the [PUC's] regulations regarding standards and billing practices, and that the proposed service, to the extent authorized by the license, will be consistent with the public interest and the policy declared in this chapter;* otherwise, such application shall be denied.
> 66 Pa.C.S. § 2809(b) (emphasis added).

5. Section 2809(c) of the Code provides, in pertinent part, as follows:

> (c) Financial responsibility.—

> (1) In order to ensure the safety and reliability of the generation of electricity in this Commonwealth, no energy supplier license shall be issued or remain in force unless the holder complies with all of the following:
> (i) Furnishes a bond or other security approved by the [PUC] in form and amount to ensure the financial responsibility of the [EGS] and the supply of electricity at retail in accordance with contracts, agreements or arrangements.
> (ii) Certifies to the [PUC] that it will pay and in subsequent years has paid the full amount of taxes imposed by Articles II and XI of the act of March 4, 1971 (P.L. 6, No. 2), known as the Tax Reform Code of 1971, and any tax imposed by this chapter.
> (iii) Provides the [PUC] with the address of the participant's principal office in this Commonwealth or the address of the participant's registered agent in this Commonwealth, the latter being the address at which the participant may be served process.
> (iv) Agrees that it shall be subject to all taxes imposed by the Tax Reform Code of 1971 and any tax imposed by this chapter.
> Failure of an [EGS] to pay a tax referred to in this paragraph or to otherwise comply with the provisions of this paragraph shall be cause for the [PUC] to revoke the license of the electricity supplier.
> 66 Pa.C.S. § 2809(c).

requirements on EGS companies that the PUC finds necessary to protect the public. Similarly, section 2809(e) of the Code gives the PUC powers and duties to impose requirements necessary to maintain the quality of service provided by EGS companies.

(e) **Form of regulation of electric generation suppliers.**—The[PUC] may forbear from applying requirements of this part [the Code] which it determines are unnecessary due to competition among electric generation suppliers. In regulating the service of electric generation suppliers, the [PUC] *shall impose requirements necessary to ensure that the present quality of service provided by electric utilities does not deteriorate,*[6] including [1] assuring that adequate reserve margins of electric supply are maintained[7] and [2] assuring that 52 Pa.Code Ch. 56 (relating to standards and billing practices for residential utility service) are maintained.

66 Pa.C.S. § 2809(e) (emphasis added).

Having reviewed the purpose, scope, subject matter, powers and duties set forth in the Competition Act, we conclude that the legislature has set forth definite and reasonable standards for the regulation of EGS companies. The legislature's direction with respect to licensing, financial responsibility, reserve margins and billing practices is clear. With respect to other Code requirements that the PUC might impose upon EGS companies, the legislature requires that the PUC consider the "present" quality of service, the protection of the public and the safety and reliability of the system.

Conectiv's concern here is that the legislature has given the PUC "unfettered" discretion to impose other requirements upon EGS companies under the Code. (Conectiv's brief at 21.) We do not agree that the PUC's discretion in that regard is "unfettered." The PUC may impose the Code's requirements upon EGS companies only when such requirements are necessary to maintain the quality of service, to protect the public or to ensure the safety and reliability of electric service. When the PUC decides to impose additional Code requirements upon EGS companies, the PUC must be prepared to defend its action in light of these standards.

With respect to the PUC's assessment of EGS companies for their share of administrative costs under section 510 of the Code, it is not necessary for the PUC to defend its action. Section 510(f) of the Code specifically states that its purpose is to have each "public utility" subject to the Code pay the PUC a reasonable share of the PUC's administrative costs. As we stated in *PPL Energyplus*, EGS companies are "public utilities" subject to certain provisions of the Code, making them subject to the PUC's administrative oversight. Therefore, it certainly makes sense that EGS companies must pay their share of the PUC's administrative costs under section 510 of the Code.

6. Thus, the legislature has set the quality of service in the pre-competitive market as the standard for future service.

7. Section 2804(1) of the Code provides, in pertinent part:

(1) The [PUC] shall ensure continuation of *safe and reliable* electric service to all consumers in the Commonwealth, including:

(i) The maintenance of *adequate reserve margins* by electric suppliers in conformity with the standards required by the North American Electric Reliability Council (NERC) and the regional reliability council appropriate to each supplier, or any successors to those reliability entities, and in conformity with established industry standards and practices.

66 Pa.C.S. § 2804(1) (emphasis added).

Accordingly, we grant the PUC's Application.

## ORDER

AND NOW, this 10th day of January, 2003, the application for summary relief filed by the Commonwealth of Pennsylvania and Pennsylvania Public Utility Commission is hereby granted.