597 A.2d 235

**LIBERTY MUTUAL FIRE INSURANCE COMPANY, et al., Petitioners,**

**v.**

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF INSURANCE and Constance B. Foster, Insurance Commissioner, Respondents.**

Commonwealth Court of Pennsylvania.

Argued June 12, 1991.

Decided Sept. 4, 1991.

James H. Cawley, for petitioners.

Kenneth B. Allen and Zella M. Smith, Asst. Counsels, for respondents.

Before CRAIG, President Judge, and DOYLE, COLINS, PALLADINO, McGINLEY, SMITH and PELLEGRINI, JJ.

SMITH, Judge.

Liberty Mutual Fire Insurance Company and Liberty Insurance Corporation (collectively Liberty Mutual) petition for review of an order of the Insurance Commissioner (Commissioner) denying Liberty Mutual's request for extraordinary circumstances relief from the private passenger automobile insurance rate reductions mandated by the Act of February 7, 1990, P.L. 11 (Act 6), amending certain provisions of Titles 18, 42, and 75 of the Pennsylvania Consolidated Statutes. This Court recently reviewed a number of issues arising under the Commissioner's inter-

pretation and application of the provision for extraordinary circumstances relief found in Act 6 at 75 Pa.C.S. § 1799.-7(b)(3)[1] in *Prudential Property and Casualty Insurance Co. v. Department of Insurance*, 141 Pa.Commonwealth Ct. 156, 595 A.2d 649 (1991), the disposition of which governs some of the issues raised herein. Pursuant to *Prudential* and the discussion set forth below, the Commissioner's order is vacated and this matter is remanded for further proceedings.

In its extraordinary circumstances relief filing, Liberty Mutual requested an overall rate increase of 7.5% which the Insurance Department (Department) denied. The Department concluded, after evaluating the data supplied by Liberty Mutual, that Liberty Mutual would earn a 14.4% after-tax rate of return on statutory surplus with its existing rates as reduced by Act 6.[2] The Department does not grant relief under Section 1799.7(b)(3) unless the anticipated rate of return on statutory surplus falls below 12%, a figure which the Department and the Commissioner contend reflects the most recent ten-year average rate of return of the property and casualty insurance industry as a whole. Liberty Mutual thereafter appealed to the Commissioner who, after a hearing before a hearing officer, disapproved Liberty Mutual's request for relief under Section 1799.7(b)(3).[3] This petition for review followed.

In a departure from other Act 6 cases before this Court, Liberty Mutual does not take issue with the Department's projections for the cost saving devices (known as

---

**1.** Section 1799.7(b)(3) provides:

An insurer aggrieved by the rate reductions mandated by this subsection [which concerns the rate rollbacks mandated by Act 6] may seek relief from the commissioner, which relief may be granted when the commissioner deems necessary in extraordinary circumstances.

**2.** For a description of the methodology by which the Department analyzes extraordinary circumstances relief requests, see *Prudential*, 141 Pa.Commonwealth Ct. at 156–162, n. 2, 595 A.2d at 652, n. 2.

**3.** During the proceedings, Liberty Mutual amended its requested rate increase to 12%.

loss reduction factors) favoring insurers as a result of the implementation of certain provisions of Act 6, nor does Liberty Mutual dispute the Department's conclusion that it will receive a 14.4% rate of return with its existing rates. Rather, Liberty Mutual argues that even this rate of return is inadequate and that it is entitled to a higher rate under Act 6 pursuant to The Casualty and Surety Rate Regulatory Act, Act of June 11, 1947, P.L. 538, *as amended*, 40 P.S. §§ 1181–1199 (Rate Act). The specific issues raised by Liberty Mutual are as follows:

1. Whether the Legislature may exclusively determine a fair and reasonable rate of return for every insurer writing private passenger automobile insurance in Pennsylvania, without notice and opportunity for the affected insurers to counter the bases upon which such a determination is made.

2. Whether the Insurance Commissioner may limit her review of Act 6 extraordinary circumstances filings to a determination of constitutional confiscation, leaving the determination of a fair and reasonable return a unilateral legislative determination.

3. Whether the statutory ratemaking standards of [the Rate Act] apply to Act 6 extraordinary circumstances filings.

4. Whether the legislatively-mandated rate reductions [of Act 6] are temporary rates requiring the Insurance Commissioner in Act 6 extraordinary circumstances proceedings to consider the effect of the rate reduction period, with the possibility of recoupment of any losses, but in any event to determine fair and reasonable rates for the rate reduction period.

5. Whether the Insurance Commissioner's generic rate of return, which is both the minimum return for relief and the maximum return achievable, provide insurers an opportunity to earn an adequate return.

6. Whether the Insurance Commissioner's determination that mutual insurers are deserving of a lesser return than

stock insurers denies Liberty Mutual equal protection under the law.

A review of Liberty Mutual's arguments as briefed, however, indicates that its arguments do not closely follow the issues purportedly raised. Rather, in an interlocking fashion, Liberty Mutual's arguments revolve around a central theme, that the ratemaking standards of the Rate Act must be utilized in extraordinary circumstances proceedings wherein the Commissioner must determine for each insurer requesting relief a fair and reasonable rate of return and enter relief accordingly. Otherwise, Liberty Mutual contends, insurers will be at the mercy of legislatively imposed rates which, if they do not provide a fair and reasonable rate of return, leaves insurers without any hope of achieving a fair and reasonable rate of return, violating due process rights as well as the intent of the Act. Further, Liberty Mutual characterizes the Act 6 rate rollbacks as "temporary rates" which mandate that the Commissioner set permanent rates in which losses suffered by insurers under the reduced temporary rates are recouped. Nothing in Act 6 supports Liberty Mutual's arguments.[4]

I

Liberty Mutual first argues that Section 31(b) of Act 6 and Section 2002 of Chapter 20 of Title 75, 75 Pa.C.S. § 2002, establish that the ratemaking standards of the Rate Act apply to determinations for extraordinary circumstances relief requests. Section 31(b) provides that the Rate Act is "repealed to the extent inconsistent with 75 Pa.C.S. Ch. 20 (relating to motor vehicle insurance rate review procedures)." Section 2002 provides:

This chapter applies to all rate filings for motor vehicle insurance. Rate filings for motor vehicle insurance shall

4. This Court's scope of review of these issues is limited to a determination of whether the Commissioner's adjudication violates constitutional rights, is not in accordance with law or agency procedure, or is based upon necessary findings of fact not supported by substantial evidence. An agency's adjudication is not in accordance with law if it represents a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. *Prudential.*

also be subject to the [Rate Act]. Where any conflict exists between this chapter and the [Rate Act], this chapter shall be applied so as to supersede the [Rate Act] to the extent of the conflict.

Liberty Mutual contends that since Act 6 repeals the Rate Act only when in conflict with Chapter 20 of Title 75, it is not repealed with respect to other chapters of Title 75 and therefore the Rate Act must apply to the extraordinary circumstances proceedings provided for in 75 Pa.C.S. § 1799.7(b)(3) (Chapter 17 of Title 75).

Liberty Mutual's argument, however, fails by mistaking extraordinary circumstances relief proceedings for rate proceedings. Extraordinary circumstances relief is from a possible detrimental effect of the rates imposed by Act 6 upon insurers; it is not a ratemaking provision in its own right as Liberty Mutual contends. Section 1799.7 is clear in this regard. According to its provisions, all insurers shall file for new private passenger motor vehicle rates for policies issued or renewed on or after July 1, 1990. 75 Pa.C.S. § 1799.7(a). These new rates must be reduced from current rates by at least 22% for insureds electing a limited tort option and 10% for insureds electing a full tort option. 75 Pa.C.S. § 1799.7(b). These rates are *deemed to comply* with the Rate Act. 75 Pa.C.S. § 1799.7(c). Further, all such rates shall be frozen from July 1, 1990 to June 30, 1991. 75 Pa.C.S. § 1799.7(e). Any increase in rates after July 1, 1991 but before June 30, 1992 shall be limited as set forth in this section and must be justified. 75 Pa.C.S. § 1799.7(f). Extraordinary circumstances relief is provided only from the rate rollbacks mandated by Section 1799.-7(b)(1) and (2). 75 Pa.C.S. § 1799.7(b)(3).

It is therefore eminently clear that the legislature has not contemplated that the extraordinary circumstances relief provision was designed to allow an insurer a new rate hearing following the mandated rate rollbacks. *See also Prudential,* 141 Pa.Commonwealth Ct. at 185–186, 595 A.2d at 664 ("this Court discerns no merit in a contention that a provision granting extraordinary circumstances relief from

rates mandated by the legislature would constitute the equivalent of granting an insurer a brand new rate hearing"). Moreover, Section 1799.7(b)(3) permits the Commissioner to grant relief only when she *"deems [it] necessary in extraordinary circumstances,"* which words speak for themselves. 75 Pa.C.S. § 1799.7(b)(3) (emphasis added). *See also Prudential.* If the legislature intended to direct the Commissioner to set new rates in accordance with the Rate Act by this provision, it surely would have said so and not deemed its mandated rates to be in compliance with that act.

## II

■ Further, the rates mandated by Section 1799.7 are not "temporary" rates of the kind suggested by Liberty Mutual, which involve temporary rate reductions or suspensions imposed upon public utilities pursuant to applicable legislation. The effect of inadequate rates set on a temporary basis may, if in accordance with the statutory scheme, be taken into account when permanent rates are thereafter fixed. *See Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 69 Pa.Commonwealth Ct. 554, 452 A.2d 86 (1982), *aff'd,* 505 Pa. 603, 482 A.2d 1272 (1984). In contrast to these temporary rate reductions or suspensions, the rates mandated by Section 1799.7 are counterbalanced by cost savings to insurers written into Act 6.[5] *See Ohio Casualty Insurance Co. v. Insurance Department,* 137 Pa.Commonwealth Ct. 299, 309, n. 7, 585 A.2d 1160, 1165, n. 7 (1991) (the cost saving provisions of Act 6 provide a *quid pro quo* for the Act 6 rate reductions). Thus, rate relief to insurers is not required or anticipated under Act 6 unless an insurer demonstrates that its rate of return is inadequate in an extraordinary circumstances relief procedure. Moreover, there is again nothing set forth in Section 1799.7(b)(3) which indicates that it is more than its words represent—a provision

---

**5.** Liberty Mutual has not challenged the anticipated effect of the Act 6 cost savings in these proceedings.

for relief when the Commissioner deems it necessary in extraordinary circumstances. Further, to read into this section a mechanism by which the Commissioner is authorized to set "permanent" rates following the legislature's imposition of "temporary" rates not only goes beyond the unambiguous language of the section but conflicts with the remainder of Section 1799.7 which deals with the future course of the rates affected by Section 1799.7(b)(1) and (2).

## III

 Liberty Mutual contends that unless its interpretation of Section 1799.7(b)(3) is adopted, it and other insurers are denied due process under the law because they have been deprived of an opportunity to challenge the legislature's unilateral determination that the rates mandated by Section 1799.7 are adequate and in compliance with the standards of the Rate Act. Liberty Mutual provides no authority to support its contention, and it is clearly groundless. In *Ohio Casualty*, this Court stated:

> It is certainly constitutional for the legislature to decide that future rates be reduced provided insurers continue to receive a fair rate of return and the [Section 1799.7](b)(3) provision is the constitutional safety valve which will assure that Act 6 does not impact in a confiscatory manner upon particular insurers. Thus, we do not believe that Section 1799.7(b) has created an unconstitutional taking by implementing confiscatory rates. Further, because Petitioners have no property right in continuing to charge their pre-Act 6 rates, there is no denial of due process in the mandated rate reductions.

*Id.*, 137 Pa.Commonwealth Ct. at 309, 585 A.2d at 1165 (footnotes omitted). Moreover, Liberty Mutual does not dispute the authority of the legislature to set rates, and it is therefore anomalous for it to argue that insurers must first have a say in a determination of whether those rates are adequate. Section 1799.7(b)(3) provides the necessary safeguard for any insurer which happens to find the mandated

rates inadequate. *See also Keystone Insurance Co. v. Foster,* 732 F.Supp. 36 (E.D.Pa.1990).

## IV

■ Liberty Mutual further challenges the Commissioner's selection of a 12% rate of return benchmark as a method by which extraordinary circumstances relief is determined. Liberty Mutual contends that this rate of return, which it describes as the minimum and maximum return achievable by an insurer under the Commissioner's scheme, does not provide insurers an opportunity to earn an adequate return.

First, there is no basis to support Liberty Mutual's contention that 12% is the maximum rate of return achievable. If an insurer enjoys a rate of return in excess of 12%, the Commissioner shall certainly do nothing to cut it back. The Commissioner uses the 12% rate of return as a floor only. Second, the issue of the Commissioner's use of the 12% rate of return was settled in *Prudential.* In that case, this Court found that the Commissioner's determination to base extraordinary circumstances relief against a rate of return reflecting the historical experience of property and casualty insurers to be within her discretion. Further, this Court determined that the Commissioner was correct in adopting a standard that insured that insurers' rates would be nonconfiscatory, *i.e.,* fair and adequate, and that its use of an historical rate of return satisfied that standard:

> In the present case, the Commissioner applied a rate standard that reflected the property and casualty insurance industry's average experience over a period of ten years. Certainly, if an insurer was achieving this rate of return under Act 6, it can hardly be called confiscatory, or less than fair and adequate, unless the rates received by insurers during the last ten years were on the average confiscatory. Not surprisingly, the record contains no evidence that they were.

*Id.,* 141 Pa.Commonwealth Ct. at 183–184, 595 A.2d at 663 (footnote omitted).[6]

Liberty Mutual contends that the use of an historical period as a measure by which extraordinary relief is governed is improper in light of the testimony of its expert witnesses which advocate a different approach. This is a matter to be decided in the Commissioner's discretion, however; and this decision must be upheld if supported by substantial evidence. *Id.* There is nothing in the record which demonstrates that the Commissioner abused her discretion in not following Liberty Mutual's proposed method by which the appropriate rate of relief should be measured, particularly where it appears that this method is not fully related to the experience of motor vehicle insurers in Pennsylvania. *See* N.T., pp. 18–21. Further, Liberty Mutual also advocates using historical data to determine adequacy of rates.

■ Of course, there is nothing preventing an insurer from challenging the adequacy of the threshold rate which the Commissioner utilizes in extraordinary circumstances proceedings as to that insurer. *Prudential.* Liberty Mutual does this. An insurer, however, is not entitled to maximum profits or even a rate of return as high as that prevailing in the industry prior to government regulation. *State Farm Mutual Automobile Insurance Co. v. State of New Jersey,* 124 N.J. 32, 590 A.2d 191 (1991). Therefore, the Commissioner's focus in extraordinary circumstances proceedings upon whether an insurer achieves an adequate rate of return measured by the historical experiences of such insurers does not constitute a flagrant abuse of her discretion. *See Prudential.*

■ In *Prudential,* however, it was also determined that the exact rate of return used by the Commissioner must be determined at a later proceeding since the record did not support the Commissioner's finding that 12% reflected the historical rate of return of property and casualty insurers.

6. *Prudential* also resolves the issue of whether the Commissioner correctly used a "nonconfiscatory" standard as opposed to a "fair and reasonable" standard.

The same is true of this case, as the record lacks substantial evidence to support the Commissioner's use of 12% as the appropriate rate of return.[7] Therefore, although Liberty Mutual's general arguments are without merit, this matter must be remanded in accordance with *Prudential* so that the Commissioner may consider and take evidence, where necessary, on the issue of the appropriate threshold rate of return and thereafter determine whether Liberty Mutual is entitled to relief under Section 1799.7(b)(3).[8]

## ORDER

AND NOW, this 4th day of September, 1991, the order of the Insurance Commissioner in this matter, dated September 7, 1990, is hereby vacated, and this case is remanded to the Insurance Commissioner to take additional evidence where necessary and thereafter make specific findings of fact, conclusions of law, and a final adjudication not inconsistent with the attached opinion.

Jurisdiction relinquished.

7. Indeed, there is also testimony in this case from Liberty Mutual's expert that 14.5% is the appropriate rate of return using the Commissioner's method of following the historical ten-year average rate of return of property and casualty insurers. This expert also disputes certain approaches used by the Commissioner in evaluating data under the methodology used by the Commissioner.

8. Liberty Mutual's final argument—that it was denied equal protection under the law because the Commissioner determined that mutual insurers are deserving of a lesser return than stock insurers—is without merit. There is no evidence in the record that Liberty Mutual has been treated differently than any other insurer, stock or mutual, appearing before the Commissioner for extraordinary circumstances relief. In fact, all evidence is to the contrary.