604 A.2d 1191

**BOSTON OLD COLONY INSURANCE COMPANY et al., Petitioners,**

v.

**INSURANCE DEPARTMENT of the COMMONWEALTH OF PENNSYLVANIA and Constance B. Foster, Insurance Commissioner, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Nov. 20, 1991.

Decided March 2, 1992.

144

H. Lee Roussel, for petitioners.

Terrance A. Keating, for respondents.

Before CRAIG, President Judge, and COLINS, PALLADINO, McGINLEY, SMITH, PELLEGRINI and KELLEY, JJ.

COLINS, Judge.

Boston Old Colony Insurance Company, the Buckeye Union Insurance Company, Commercial Insurance Company of Newark, New Jersey, the Continental Insurance Company, the Fidelity & Casualty Company of New York, Fireman's Insurance Company of Newark, New Jersey, the Glens Falls Insurance Company, Kansas City Fire & Marine Insurance Company, and Niagara Fire Insurance Company (collectively, the Company) petition for review of the February 4, 1991 order and adjudication of Constance B. Foster, Insurance Commissioner of the Commonwealth of Pennsylvania (Commissioner), which affirmed the Insurance Department's (Department) disapproval of the Company's extraordinary circumstances filing.

The Act of February 7, 1990, P.L. 11 (Act 6), amended, in pertinent part, the Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. §§ 1701–1799.7. Pursuant to Act 6, each motor vehicle liability insurer was required to file new private passenger motor vehicle rates on or before May 1, 1990. Those rates were to be rolled back from the rates in effect on December 1, 1989. Specifically, an insured who chose the "full tort option," as set forth in Act 6, was to receive a rollback of at least 10%, and an insured choosing the "limited tort option," also known as the "verbal threshold," was to receive a rollback of at least 22%. An insurer aggrieved by the rate rollbacks could seek relief from the

Commissioner, who could grant such relief when she deemed it necessary in extraordinary circumstances.

The Company timely filed its rolled back rates, and on June 18, 1990, it sought extraordinary circumstances relief. In its extraordinary circumstances filing, the Company not only sought relief from the rollback but also sought rate increases of 9.5% for its Monoline program and 10.9% for its Link Plus program. The Department denied the Company's request for extraordinary circumstances relief on August 24, 1990, and the Company requested a hearing pursuant to 75 Pa.C.S. § 2005. The hearing was held on December 5 and 6, 1990, and on February 4, 1991, the Commissioner issued her order and adjudication denying extraordinary circumstances relief.

The Company timely filed a petition for review with this Court and has presented four issues as follows:

1. Whether the Commissioner's order deprived the Company of its constitutional right to a nonconfiscatory rate of return.

2. Whether the order is contrary to law.

3. Whether the order is supported by substantial evidence.

4. Whether the order violates the Administrative Agency Law and the Company's due process rights.

The Company's brief does not strictly follow the statement of questions, and this opinion will follow the arguments as presented in the brief.

This Court's scope of review is set forth at 2 Pa.C.S. § 704. This Court must affirm the Commissioner's adjudication unless we find that the adjudication violates the Company's constitutional rights, is not in accordance with law, violates the practice and procedure of Commonwealth agencies, or that a finding of fact necessary to support the adjudication is not supported by substantial evidence. The Commissioner's adjudication is not in accordance with law if it represents "a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or

functions." *Slawek v. State Board of Medical Education and Licensure*, 526 Pa. 316, 322, 586 A.2d 362, 365 (1991) (quoting *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 573, 109 A.2d 331, 335 (1954)).

## I.

█ The Company first argues that the Commissioner erred in concluding that it was not entitled to extraordinary circumstances relief, and it discusses three areas: correction of data errors, comprehensive and collision loss trends, and credibility weighting.

According to the Company, the Commissioner erred when she refused to consider data corrections it presented in its prefiled testimony and at the hearing. The Company argues that while preparing its prefiled testimony, it discovered that, in its extraordinary circumstances filing, it had inadvertently used losses as of March, 1989 instead of losses as of March, 1990. Its losses, the Company therefore argues, were substantially below what should have been reported, and the Company attempted to correct its error by correcting its calculations. The Commissioner counterargues that the Company's corrected data was of little probative value, because the administrative appeal was of the extraordinary circumstances filing, and the Department's entire review was based on that filing. Additionally, the Commissioner argues that the corrected loss data was not even presented at the hearing; only calculations incorporating that data were presented. We find that the Commissioner committed no error of law and did not abuse her discretion in refusing to consider recalculations based on loss data unavailable to her. Similarly, we reject the Company's argument that the Commissioner erred, when she did not consider its revised loss trends for its comprehensive and collision coverage.

█ The Company also argues that the Commissioner erred by accepting the Department's lack of credibility weighting. According to the Company, the Commissioner's decision was contrary to the testimony of the Department's

own expert witness, Donald Bealer (Bealer), and was, therefore, not supported by substantial evidence. According to the Company, Bealer testified that the Company's methodology with respect to credibility weighting was preferable to the Departments methodology. In contrast, the Department argues that the Commissioner properly rejected the Company's methodology for credibility weighting, because such weighting is properly applied to losses, but the Company applied credibility weighting to its uninsured motorist and underinsured motorist rate. Our review of the record reveals that there is substantial evidence to support the Commissioner's determination that the Department's lack of credibility weighting was reasonable. The testimony of Bealer is not as clear as the Company would have us believe, and he clearly stated that he found the Department's approach to credibility weighting to be reasonable.

## II.

The Company next argues that the Commissioner's adjudication is not supported by substantial evidence and is contrary to controlling federal law with respect to the Commissioner's affirmance of the Department's estimated cost savings from Act 6.

According to the Company, the Commissioner exaggerated the savings to be realized from the elimination of duplicate recoveries of medical payments pursuant to 75 Pa.C.S. §§ 1720 and 1722. The Company argues that pursuant to *FMC Corporation v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990), 75 Pa.C.S. § 1720 is preempted by the federal Employee Retirement Income Security Act with regard to self-insured health plans. 75 Pa.C.S. § 1720 prevents subrogation from a claimant's tort recovery with respect to workmen's compensation benefits, and with respect to other benefits including benefits paid or payable by a program, group contract, or other arrangement. The Company argues that its expert testified that 16% of the population is covered by self-insured health plans and that the Commissioner erred when she did not reduce the De-

partment's estimated cost saving to reflect the additional insureds for whom the ban on subrogation does not apply. In contrast, the Department argues that the Company's expert did not include any consideration for self-insured health plans in his cost savings estimate and that the Company "proports [sic] to show the effect of this element, for the first time, in its appellate brief." According to the Department, the Commissioner did not err, when she determined that the Company's evidence on the impact of *FMC Corporation* was vague and incomplete. We agree that the Commissioner did not err, when she determined that the evidence did not support a finding that a loss reduction factor based on *FMC Corporation* is appropriate.

■ The Company next argues that the Commissioner erred by accepting the Department's figures for the out-of-state losses which would remain in the Pennsylvania insurance system. The parties do not dispute the fact that payments for out-of-state claims remain in the system despite the ban on duplicate recovery set forth at 75 Pa.C.S. § 1722, but the Company argues that the Commissioner, while recognizing continued losses because of bodily injury claims, did not recognize continued losses because of payments for medical expenses. The Company also argues that the Commissioner improperly relied on the experience of Michigan, which has a similar automobile insurance law. As we stated in *Federal Kemper Insurance Company v. Insurance Department*, 143 Pa.Commonwealth Ct. 545, 600 A.2d 244 (1991), "[t]he Commissioner's determination that health insurance will in many cases cover any excess above the minimal first party coverages supports a reliance on the Michigan data." *Id.*, 143 Pa.Commonwealth Ct. at 553 n. 3, 600 A.2d at 248 n. 3. Our review of the record reveals that the Commissioner's determination that out-of-state claims are adequately addressed by the Department's model is supported by substantial evidence.

■ The Company then argues that the Department did not properly account for the fact that liability payments are made by insurers directly to hospitals and doctors and that

Medicare is excess to and can subrogate to automobile insurance. This issue was decided in favor of the Commissioner in *Prudential Property & Casualty Insurance Company v. Department of Insurance*, 141 Pa.Commonwealth Ct. 156, 595 A.2d 649 (1991).

The Company argues that the Department's model makes no allowance for an insurer's payment of health insurance deductibles and/or co-payments. The Commissioner was well within her discretion when she determined that the Company did not establish the impact of any deductibles and/or co-payments remaining in the automobile insurance system.

The Company incorporates arguments from another insurer's extraordinary circumstances appeal regarding its assertion that the Department's model does not account for the fact that "[h]ealth insurance policies generally provide they are excess to, and will not pay when there is, automobile insurance." The arguments of that insurer and the supporting evidence thereto are not of record in this case, and we will not, therefore, address this issue. We note, however, that it was resolved in the Commissioner's favor in *Federal Kemper*.

### III.

The Company next argues that the Commissioner exaggerated the savings from the "medical cap" imposed by 75 Pa.C.S. § 1797. That section limits payment to persons or institutions providing treatment, accommodations, products, or services to an injured person to 110% of the Medicare payment or, if payment has not been calculated under Medicare, to an amount that does not exceed 80% of the provider's usual and customary charge. With regard to treatment at accredited trauma centers, payment is limited to the usual and customary charge.

The Company first argues, with respect to the medical cap, that the Commissioner incorrectly accepted the testimony of Bealer that trauma centers would handle 12.5% of all medical care and that she incorrectly rejected the testimony

of its expert witness, Jerry W. Rapp (Rapp) that such centers would handle 30% of all medical care. According to the Company's brief, Rapp computed his figure by "match[ing] the types of injuries sustained in auto accidents from the AIRAC data against the generally-accepted types of injuries that should go to trauma centers...." The Department developed its estimate by dividing the number of Pennsylvania hospitals by the number of Pennsylvania trauma centers and then assumed that all care rendered by a trauma center was exempt from the medical cap. The Commissioner, acting well within her discretion, decided that the Department's estimate was more reasonable than the Company's. The Company presented no evidence to support its assertion that its estimate of the medical cap cost savings is superior to that of the Commissioner.

■ The Company argues that the Department's methodology regarding physician reimbursement is flawed, because Medicare reduces physicians' billings for several factors not applicable to Act 6. According to the Company, the Department's reliance on Medicare's total fee reduction exaggerates the savings which insurers will receive. Our review of the record reveals that there exists substantial evidence to support the Commissioner's determination that the Department's estimate of the savings from the medical cap is more reasonable than the Company's, in light of the Company's use of nationwide, rather than Pennsylvania specific, data and its lack of evidence regarding its "concerns" about the model.

The Company next argues that the Department overestimated the savings resulting from the peer review process mandated by 75 Pa.C.S. § 1797(b). Bealer, however, clearly stated that the charges gleaned from Medicare data were net of the effect of peer review, and the Commissioner was within her discretion in relying on his testimony.

## IV.

The Company argues that the Commissioner exaggerated the savings from the verbal threshold, also known as the

limited tort option. 75 Pa.C.S. § 1705 provides that an insured who elects the limited tort option is precluded from suing for non-economic damages unless his or her injuries are "serious." Act 6 defines a serious injury as one "resulting in death, serious impairment of body function or permanent serious disfigurement." 75 Pa.C.S. § 1702. This issue has been decided in the Department's favor by *Federal Kemper.*

## V.

According to the Company, the Commissioner exaggerated the savings from the anti-fraud provisions of Act 6, when she accepted the Department's estimate that insurers would save 5%. This issue has also been decided by *Federal Kemper.*

## VI.

According to the Company, the Commissioner erred, when she concluded that Act 6 will reduce the frequency of first party benefits claims. The Company argues that the Department incorrectly found a relationship between the frequency of bodily injury claims and the frequency of first party benefits claims. Therefore, according to the Company, the Commissioner erred in affirming the Department's estimate. This issue was decided in the Commissioner's favor in *Federal Kemper.*

## VII.

██ The Company argues that the Commissioner ignored its increased costs. According to the Company, it will suffer increased costs associated with inadequate assigned risk plan rates and lower "clean risk" rates. The Commissioner reasonably rejected the Company's arguments, because the assigned risk plan makes independent rate filings which will include adjustments to the clean risk program.

The Company next argues that it will suffer increased costs, because Act 6 has eliminated the prohibition against a

plaintiff pleading and proving his or her medical expenses up to the mandatory first party benefits limit. *Federal Kemper* decided this issue in the Commissioner's favor.

██ The Company also argues that it will suffer increased costs because Act 6 lowers the mandatory minimum amount of first party benefits coverage. The Company argues that costs not covered by first party benefits will be shifted to bodily injury and underinsured or uninsured motorist coverage. The Commissioner determined that any additional cost would be shifted to health care insurance for 85% of the population and, therefore, denied the Company any additional adjustment for this factor. We find no reason to disturb the Commissioner's determination, because it is supported by substantial evidence.

## VIII.

The Company argues that the Commissioner improperly allocated the burden of proof. According to the Company, once it made a prima facie case of its need for extraordinary circumstances relief, the Department had the burden to go forward with contrary evidence, which it often did not do. The Company argues that the burden shifted to the Department to produce rebuttal testimony in order to prevent the Company from prevailing on an issue. The issue of the proper burden of proof was discussed in *Prudential* and in *Liberty Mutual Fire Insurance Company v. Department of Insurance*, 142 Pa.Commonwealth Ct. 282, 597 A.2d 235 (1991), and was decided in the Commissioner's favor in *Federal Kemper.*

## IX.

██ The Company next argues that the Commissioner erred when she considered the prefiled, direct testimony of Bealer. The Company argues that his testimony should have been struck, because he did not author the Department's model and various exhibits to his testimony. The Company states that the Department's model "escaped the

test of cross-examination," and, therefore, the Company's constitutional due process rights and its right to cross examination were violated. The Commissioner determined that Bealer's testimony was properly admitted, "because he independently determined that [the Department's model] was reasonable, used it to review [the Company's] request for extraordinary circumstances relief, and was present to defend his opinion that no relief was warranted." As the Commissioner stated, he prepared his own prefiled testimony, reviewed the Company's extraordinary circumstances filing, made his own independent calculations and reviewed the Department's calculations, discussed the model with Department personnel, reviewed the assumptions, calculations, back-up material, and sources for the model, and demonstrated his working knowledge of the model under cross examination. According to the Commissioner his testimony was "appropriate expert testimony."

The Pennsylvania Supreme Court stated in *Commonwealth v. Daniels*,[1] that the opinions of expert witnesses rest invariably on hearsay.

> An expert's opinion is derived not only from records and data, but from education and [from] a lifetime of experience. Thus, when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise.

Further, that Court stated, in *Pittsburgh Outdoor Advertising Corporation Appeal*, 440 Pa. 321, 327, 272 A.2d 163, 166 (1970),

> [t]he use by a testifying valuation expert of facts and figures derived from others and of which he himself does not have personal knowledge occurs frequently and is not a new development. To require direct personal knowledge by the expert witness of every element going to

1. 480 Pa. 340, 347–48, 390 A.2d 172, 176 (1978), (quoting *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir.1971) (en banc), *cert. denied*, 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972)).

make up an appraisal figure would be to require the impossible. That there may thus be some hearsay evidence comprised within opinion evidence is undeniable. The components of an expert's opinion, however, go to weight, not admissibility.

We find, based on our review of the record and the relevant case law, that the Commissioner did not err in considering Bealer's testimony.

## X.

According to the Company, the Commissioner erred when she determined its rate of return over a seventeen month period from February, 1990 to July 1, 1991. This issue was decided in the Commissioner's favor in *Prudential.*

## XI.

 Finally, the Company argues that the Commissioner's 12% rate of return is constitutionally inadequate. The Company contends that the Department should not have used a ten year historical rate of return when it determined its target rate of return of 12% on statutory surplus. We find that the Commissioner did not abuse her discretion, when she determined that the Department's methodology for establishing a target rate of return is reasonable. We note, additionally, that the Company's own exhibits and testimony establish that even if it had been granted the extraordinary circumstances relief which it sought, it would have received a rate of return on statutory surplus of only 8%, which its own expert admitted was not constitutionally confiscatory.

Accordingly, the order and adjudication of the Commissioner are affirmed.

## ORDER

AND NOW, this 2nd day of March, 1992, the order and adjudication of the Insurance Commissioner, in the above-captioned matter, are affirmed.