**LAUNDRY OWNERS MUTUAL LIABILITY INSURANCE ASSOCIATION, Petitioner**

v.

**INSURANCE COMMISSIONER OF the COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 10, 2014.

Decided May 20, 2014.

Shawn C. Gooden, Harrisburg, for petitioner.

W. Christopher C. Doane, Department Counsel, Harrisburg, for Respondent.

Seth Cooley, Philadelphia, for intervenor Pennsylvania Compensation Rating Bureau.

BEFORE: COHN JUBELIRER, Judge, and SIMPSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Laundry Owners Mutual Liability Insurance Association (Laundry Owners) petitions for review of the Order of the Insurance Commissioner of the Commonwealth of Pennsylvania (Commissioner) affirming, in part, the Final Determination of the Technical Director of Classifications and Field Operations (Director) of the Pennsylvania Compensation Rating Bureau (PCRB). The Commissioner ordered that, under the workers' compensation insurance policies issued by Laundry Owners to Touch–Stone, Inc. (Touch–Stone), some of TouchStone's workers were to be assigned Code 941 (Social Rehabilitation Facility) for purposes of calculating Touch–Stone's premium, while others were to be assigned Code 951 (Salesperson—Outside) and Code 953 (Clerical Office Employees) and, therefore, charged lower premiums. Before this Court, Laundry Owners argues that the Commissioner erred in classifying Touch–Stone's operations as separate enterprises rather than as a single enterprise and in classifying some of TouchStone's employees under Code 951. Discerning no error, we affirm.

Pursuant to Section 707 of the Workers' Compensation Act (Act),[1] "every workers' compensation insurer is required to be a member of a rating organization and must adhere to the uniform classification system of the rating organization to which it belongs." *Grimaud v. Pennsylvania Insurance Department*, 995 A.2d 391, 394–95 (Pa.Cmwlth.2010). The PCRB is such a rating organization. Section 654 of the Insurance Company Law of 1921[2] (Law), requires the PCRB to file with the Commissioner for his modification, amendment, or approval, "a system of classifications of risks, underwriting rules, premium rates, and a schedule or merit rating plans for workers' compensation insurance in Pennsylvania." *Grimaud*, 995 A.2d at 394. The PCRB has promulgated, and the Commissioner has accepted, the Pennsylvania Workers' Compensation Manual of Rates, Classifications and Rating Values for Workers' Compensation and for Employ-

1. Act of June 2, 1915, P.L. 736, added by Section 20 of the Act of July 2, 1993, P.L. 190, *as amended*, 77 P.S. § 1035.7.

2. Act of May 17, 1921, P.L. 682, *as amended*, 40 P.S. § 814.

ers Liability Insurance (Manual) as its uniform classification system. *Id.* at 395 & n. 5.[3] The purpose of the Manual's classification system "is to assign the one basic classification which best describes each distinct business enterprise of the insured." (Manual, Underwriting Rules, § 1(IV)(C)(1)(a).) However, where an employer operates discrete business enterprises that cannot be covered by a single classification, more than one classification may be assigned. (Manual, Underwriting Rules, § 1(IV)(C)(2)(b).)

Laundry Owners is an insurer that provides workers' compensation insurance; Touch–Stone is one of its insureds. Laundry Owners is a member of the PCRB. Laundry Owners wrote workers' compensation insurance policies for Touch–Stone for policy years commencing September 20, 2009 and September 20, 2010 (the Coverage Periods). Touch–Stone "is a not-for-profit human services agency providing services to families and individuals in northwestern Pennsylvania." (Adjudication, Findings of Fact (FOF) ¶ 17(a).) Touch–Stone provides both residential and non-residential programs, working with children and adults with mental retardation or mental health disabilities. Touch–Stone provides three programs: (1) Life Enrichment and Community Integration Services (LECIS); (2) Behavioral Health Rehabilitation Services (BHRS); and (3) Adult Autism Waiver Services (AAWS). (FOF ¶¶ 1–2, 4, 9, 17(a)-(b), 29.)

The LECIS program includes two residential programs and a day program. In one residential program, Lifesharing through Family Living, Touch–Stone does not provide any direct care; instead, clients are placed with foster families. In the other residential program, group homes are staffed around the clock by 17 Touch–Stone employees called Community Living Coaches. In the non-residential day program, called Home and Community Habilitation, Job Coaching and/or Companion, 20 employees, called Life Skills Coaches, provide one-on-one services to clients in the clients' communities during the day. Six Community Living Coaches from the residential program also work in the day program. The LECIS program also includes 4 office-based employees who have little client contact and a Program Coordinator who has almost no direct client contact. (FOF ¶¶ 35–41.)

The BHRS program "is a community[-]based service that emphasizes therapeutic interventions, behavioral modifications and mentoring for persons under 21 years of age." (FOF ¶ 31.) The BHRS staff comprises 16 individuals: 12 Therapeutic Support Staff, 3 Behavioral Specialist Consultants/Mobile Therapists (Mobile Therapists), and a Program Coordinator. The 12 Therapeutic Support Staff work almost exclusively one-on-one with clients in the client's school, home, and community. The Mobile Therapists split their time between the clients' locations and their offices. (FOF ¶¶ 32–34.)

The AAWS program is minimal compared to Touch–Stone's other two programs, providing job coaching for adults with autism. The same Program Coordinator oversees the AAWS and BHRS pro-

---

**3.** The Commissioner noted in his Adjudication that "[t]he parties stipulated to the incorporation of the Manual as part of the record but did not specify a particular version or attach a copy of the applicable version." (Adjudication at 5 n. 4.) The Commissioner used the April 1, 2009 version of the Manual since this was the version applicable during the first coverage period at issue in this case. Since neither the PCRB nor Laundry Owners objected, references to the Manual in this opinion are also to the April 1, 2009 version of the Manual. This version may be found at http://pcrb.com/pcrb/manuals/Files/manuals/pa_basic_manual_4-1-09.pdf (last visited April 23, 2014).

grams. One of the BHRS program's Mobile Therapists also provides services to the AAWS program. (FOF ¶¶ 30, 32; Letter from Touch–Stone to Director (October 27, 2011) at 4, R.R. at 52a.)

At the beginning of the first Coverage Period, Laundry Owners assigned some of Touch–Stone's employees a classification under the Manual of Code 941[4] and the rest to Code 976 (Y.M.C.A., Y.W.C.A.).[5] During this Coverage Period, Laundry Owners engaged a third party to conduct a payroll audit of Touch–Stone. As a result of this payroll audit, at the end of the first Coverage Period, Laundry Owners assigned Code 941 to all of Touch–Stone's employees. Laundry Owners also submitted an inquiry to the PCRB asking:

"Why are two 'all inclusive' classifications approved for [Touch–Stone]? Please review the company operations to determine whether class 976–YMCA should be an approved classification. From conversation with the employer it appears that they do not provide any services that would fall within the scope of class 976 and therefore this class should not be approved."

(FOF ¶ 14 (quoting Stipulation ¶ 14).) In response to this inquiry the PCRB initiated a survey, and subsequently a re-survey, of Touch–Stone's business. (FOF ¶¶ 11–12, 15–16.)

After a preliminary determination by the PCRB and correspondence between the PCRB and Laundry Owners, PCRB's Director, on January 27, 2012, issued a Final Determination letter to Laundry Owners stating that for the Coverage Periods: the 17 Community Living Coaches working in the LECIS residential group home program shall be assigned Code

4. The Manual defines Code 941 as follows:

> Applicable to non-medical residential care facilities providing a transitional non-institutional environment in a group setting which emphasizes through guidance and counseling the social rehabilitation and the eventual reintegration of the resident into the community. Such facilities include: Community Residential Rehabilitation Services (CRSS) for mentally ill clients regardless of client count per facility.
>
> Residential facilities for children provide a non-institutional environment focusing on socialization and reintegration into the community. Residents in these facilities are usually pre-teen to 18 years of age. At these facilities individualized programs are designed to rehabilitate the child. Emphasis is placed upon reuniting children with their families, placing children in foster care or moving them into a group home where independent living skills are stressed.
>
> Community Residential Facilities operating group homes with 8 or fewer mentally disabled residents which are not licensed as [an] intermediate care facility for the mentally retarded (ICF/MR) are community based residential programs providing supportive services for a more highly functional client. Clients in these group homes

> access community based programs for the mentally retarded. These clients do not require the health care provided at a[n] ICF/MR group home. Many of these clients will become self[-]sufficient enough to move into minimal supervision apartments.
>
> Additional programs, e.g., daycare, respite care and prevocational training programs, provided by group home operators shall be included within the scope of this class. Training programs that pay the trainees for services rendered (including sheltered workshops) shall be separately classified.

(Manual, Classifications, § 2 at A91, Code 941.)

5. Code 976 includes "Y.M.C.A., Y.W.C.A., and Community Center, including summer camps and day care centers—all employees including office, except home health care services employees." (Manual, Classifications, § 2 at A103, Code 976.) Underwriting examples include adult day center, community center, day center for the elderly, daycare for the mentally disabled with no residential facility affiliation, daycare center operated by a Y.M.C.A. or Y.W.C.A., and a senior citizens center. (Manual, Classifications, § 2 at A103, Code 976.)

941; the 20 Life Skills Coaches from the LECIS program, the 4 case managers/supervisors for the LECIS program, the 12 Therapeutic Support Staff from the BHRS program, and the 3 Mobile Therapists from the BHRS program shall be assigned Code 951 (Salesperson—Outside);[6] the two Program Coordinators shall be assigned Code 953 (Clerical Office Employees);[7] and the office staff shall be classified as either Code 951 or 953. (FOF ¶ 47.)

Laundry Owners appealed the Final Determination to the Commissioner on June 20, 2012.[8] Before the Commissioner, Laundry Owners argued that the PCRB's assignment of Code 951 to Touch–Stone's employees did not accurately describe Touch–Stone's business and that Code 941, Code 942 (Home Health—Professional Staffing), Code 943 (Home Health—Non-Professional Staffing),[9] or Code 976 were more appropriate than Code 951. Touch–Stone was notified of the appeal, but did not intervene. After an evidentiary hearing was scheduled, Laundry Owners and the PCRB stipulated as to the facts of the case. The Commissioner subsequently issued his Adjudication and Order on June 14, 2013.

The Commissioner determined that the PCRB erred in separating the employees working in the residential and non-residential portions of the LECIS program for purposes of classification and that the LECIS program must be construed as a single enterprise and assigned Code 941. The Commissioner held, however, that because the BHRS and AAWS programs were separate and self-contained, they were properly considered separate enterprises from the LECIS program. The Commissioner considered alternate classifications proposed by Laundry Owners, including Codes 941, 942, 943, and 976, but ultimately concluded that employees of the BHRS and AAWS programs should be assigned to Code 951. In addition, the Commissioner held that, because Code 941 was Touch–Stone's governing classification, Touch–Stone's 4 office staff were properly assigned to Code 941 rather than Code 951 or 953. The Commissioner held that the BHRS and AAWS Program Coordinator was properly assigned Code 953 (Clerical Office Employees). (Adjudication at 24–27, 30–35, 38.)

6. The Manual does not provide a general description for Code 951, but includes a number of underwriting examples, including insurance adjuster, advertisers distributing circulars or samples, field representative for an advisory rating organization, an auctioneer without a permanent location, a travelling insurance auditor, boiler inspector, meter reader, elevator inspector, toll collector, marine appraiser or surveyor, messenger, newspaper reporter or photographer, real estate agent, and tour guide. (Manual, Classifications, § 2 at A94, Code 951.) The Manual specifically excludes from Code 951 salespersons or collectors who delivers goods and door-to-door salespersons. (Manual, Classifications, § 2 at A94, Code 951.)

7. The Manual does not define Code 953, but includes underwriting examples such as clerical office employees, computer programmer, draftsman, and telephone or telegraph operator. (Manual, Classifications, § 2 at A94, Code 953.)

8. Section 654(c) of the Law provides that any person aggrieved by the assignment of a particular classification by a rating organization such as the PCRB may appeal that assignment first to the rating organization and then, if still aggrieved, to the Commissioner. 40 P.S. § 814(c).

9. Codes 942 and 943 differ only in whether the employee is professional or nonprofessional. Underwriting examples include community nursing service, home health care services, hospice care, visiting nurse, home health aide, and chore worker. (Manual, Classifications, § 2 at A91–92, Code 942–43.)

Laundry Owners petitions this Court for review.[10] Before this Court, Laundry Owners argues that the Commissioner erred: (1) in concluding that Touch–Stone operates separate enterprises such that some of its employees in one enterprise may be classified differently than employees in another; and (2) in classifying employees in the BHRS and AAWS programs under Code 951. The Commissioner, in turn, argues that Laundry Owners waived the issue of whether Touch–Stone operates separate enterprises by failing to raise it before the Commissioner. The Commissioner argues further that, if this issue is not considered waived, its Adjudication and Order are in accordance with the Manual rules and supported by substantial evidence.

■■■ "[T]his court must affirm the Commissioner's adjudication unless we find that the adjudication violates [the insurer's] constitutional rights, is not in accordance with law, violates the practice and procedure of Commonwealth agencies, or that a finding of fact necessary to support the adjudication is not supported by substantial evidence." *Graduate Health Systems, Inc. v. Pennsylvania Insurance Department*, 674 A.2d 367, 370 (Pa. Cmwlth.1996). "The Commissioner's adjudication is not in accordance with law if it represents 'a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions.'" *Id.* (quoting *Boston Old Colony Insurance Co. v. Insurance Department*, 146 Pa. Cmwlth. 142, 604 A.2d 1191, 1193 (1992)). Because this case involves a complex statutory scheme, "we must exercise greater caution in substituting our discretion for the expertise of the Commissioner, acting as the agency head of the Pennsylvania

Insurance Department." *Grimaud*, 995 A.2d at 400 n. 8.

We preliminarily address the Commissioner's argument that Laundry Owners waived the issue of whether Touch–Stone operates separate enterprises or a single enterprise for purposes of classification under the Manual by failing to raise this issue before the Commissioner. Rule 1551(a) of the Pennsylvania Rules of Appellate Procedure provides generally that a party waives an issue when it fails to raise it before the government unit. Pa. R.A.P. 1551(a). In this case, however, Laundry Owners sufficiently raised the issue of whether Touch–Stone's operations should be considered a single enterprise to preserve it for review. Laundry Owners asserted in its brief to the Commissioner that Touch–Stone's entire business should be assigned a single classification, Code 941, stating

> the object of the classification procedure is to assign one basic classification which best describes each business enterprise of the insured in Pennsylvania; it is the business which is classified, not the individual operations within a business. In this regard, [Laundry Owners] respectfully submits that the classification which best describes Touch[-]Stone's *entire business enterprise* is Code 941....

(Laundry Owners' Brief to Commissioner at 2, R. Tab BB (emphasis added).) In addition, the Commissioner provided a thorough analysis regarding why the LECIS program should be considered a separate enterprise from the BHRS and AAWS programs. (Adjudication at 23–27.) Thus, we decline to hold that Laundry Owners waived this issue.

**10.** The PCRB has intervened in Laundry Owners' appeal to this Court, arguing in support of the Commissioner's Order.

■ We, therefore, address Laundry Owners' first argument that the Commissioner erred in determining that Touch–Stone's LECIS program should be classified as a separate enterprise from the BHRS and AAWS programs. Because Laundry Owners is challenging the Commissioner's adjudication, Laundry Owners bears the burden of proving that the classification of Touch–Stone's employees was erroneous. *See Graduate Health Systems,* 674 A.2d at 370 (stating that "the Commissioner held that [Graduate Health Systems (GHS) ] did not meet its burden of proving that its employees should be classified as Code 953 . . . or Code 951 . . ."). Laundry Owners argues that the Commissioner improperly relied upon "the PCRB's 'policy' of construing individual service programs offered by social service providers as separate enterprises." (Laundry Owners' Br. at 14.) Laundry Owners argues that there is no support in the Manual for this policy. In addition, Laundry Owners argues that Code 941 is an "all-inclusive" classification that should be construed to encompass all of Touch–Stone's employees.

As discussed above, the purpose of the Manual is to assign a single classification to an employer's business, if possible:

**Single Enterprise.** If a risk [11] consists of a single operation or a number of separate operations which normally occur in the business described by a single manual classification, or separate operations which are an integral part of or incidental to the main business, that single classification which most accurately describes the entire enterprise shall be applied. The separate operations so covered may not be assigned to another classification even though such operation may be specifically described by some other classification or may be conducted at a separate location.

(Manual, Underwriting Rules, § 1(IV)(C)(2)(b).) However, the Manual permits multiple classifications to be assigned to an employer's business when that business consists of separate enterprises:

If there are distinct enterprises (meaning thereby businesses, which are specifically classified in this Manual, but not operations that normally occur in the business described by the assigned classifications, nor operations described by any of the General Inclusions), conducted in a given plant by the same insured and the entire work in each enterprise is conducted either in a separate building or on a separate floor or floors of a building, or on the same floor in separate departments divided by floor to ceiling partitions without interchange of labor and the insured conducts each of such enterprises as a separate undertaking with separate records of payroll, then such separate undertakings shall each be separately classified, (and the proper carrier rating value applied to each).

(Manual, Underwriting Rules, § 1(IV)(C)(3)(a)(2).) Thus, while Code 941 is an all-inclusive classification designed to include an entire business, the Commissioner could properly assign a separate classification to the BHRS and AAWS programs based on his determination that they constituted a separate enterprise. As quoted above, the Manual defines separate enterprises as ones which: (1) do not normally occur in the business described by the other's classification; (2) are conducted in discrete locations or facilities; (3) do not

---

**11.** The Manual uses the term "risk" to refer to the legal entity being insured. (*See* Manual, Underwriting Rules § 1(III)(A)(1)-(4) (defining "risk," "insured," "majority interest" and "Employer/Entity").)

share labor; and (4) are conducted as separate undertakings.

We cannot say that the Commissioner erred as a matter of law or abused his discretion in determining that the BHRS and AAWS programs meet these criteria to be considered a separate enterprise from the LECIS program. While the Commissioner recognized the PCRB's policy of treating distinct social service programs as separate enterprises, the Commissioner properly relied upon the Manual's provisions regarding single and multiple enterprises in making his determination. Code 941 provides that it is "[a]pplicable to non-medical residential care facilities providing a transitional non-institutional environment in a group setting which emphasizes through guidance and counseling the social rehabilitation and the eventual reintegration of the resident into the community" and services for children providing a focus "on socialization and reintegration into the community." (Manual, Classifications, § 2 at A91, Code 941.) This definition does not encompass the BHRS and AAWS programs. The BHRS program includes community-based services emphasizing therapeutic interventions, behavioral modifications and mentoring for persons under 21 years of age. (FOF ¶ 31.) The BHRS and AAWS programs do not involve any residential care, but instead provide services in the community. Rather than providing counseling and guidance in a group setting, the BHRS and AAWS programs provide one-on-one counseling. (Letter from Touch–Stone to Director (October 27, 2011) at 3–4, R.R. at 51a–52a.) Rather than focusing on reintegration into the community, the BHRS program focuses on individuals who are already in the community. The BHRS and AAWS programs are carried out at locations separate and discrete from the LECIS program; no services for the BHRS and AAWS programs are carried out in the LECIS group homes. The two programs do not share staff and are separately managed. (Letter from Touch–Stone to Director (October 27, 2011) at 2–3, R.R. at 50a–51a.)

Laundry Owners argues that *Graduate Health Systems* supports its argument that all of Touch–Stone's operations should be considered a single enterprise. *Graduate Health Systems*, however, is distinguishable from the current matter. In that case, GHS, a corporation providing central office services for subsidiary hospitals, argued that it should be considered as a separate enterprise from those hospitals, with its employees falling within Codes 951 and 953. *Graduate Health Systems*, 674 A.2d at 372–73. In determining that GHS was a single enterprise with its subsidiary hospitals, this Court looked to the types of business encompassed by the hospitals' classification, Code 961 (Hospital). *Id.* at 373–74. This Court noted that, under the single enterprise rule, a classification includes the types of labor commonly found within the classification. *Id.* at 373. We stated that operations that normally occur within a business described by a classification may not be considered a separate enterprise. *Id.* at 374. Finding that Code 961 includes clerical employees of a hospital (and that such employees are, in fact, necessary to the operation of a hospital) this Court held that it was not appropriate to consider GHS's clerical business as a separate enterprise from its subsidiary hospitals. *Id.* at 374. However, unlike in *Graduate Health Systems*, as described above, the activities carried out in the BHRS and AAWS programs are not activities that would be expected to occur within a business classified under Code 941.

■ Finally, we address Laundry Owners' argument that the Commissioner

erred in classifying Touch–Stone's employees in the BHRS and AAWS programs under Code 951. Again, we note that the burden is on Laundry Owners to show that the classification assigned by the Commissioner is in error. Laundry Owners argues that employees in the BHRS and AAWS programs do not perform sales work and that other classifications, such as Code 892 (Early Intervention), Code 941 (Social Rehabilitation Facility), Code 942 (Home Health—Professional Staffing), or Code 943 (Home Health–Non–Professional Staffing) would be more appropriate.

■ The parties do not dispute that there is no code that exactly describes Touch–Stone's enterprise comprising the BHRS and AAWS programs. Section 1(IV)(C)(4) of the Manual, Underwriting Rules, provides that where an enterprise is not susceptible to direct classification under an existing code, it should be assigned a code that "is most analogous from the standpoint of process and hazard." (Manual, Underwriting Rules, § 1(IV)(C)(4).) As noted by the Commissioner, "[t]he classification title and definition list particular enterprises and define some business processes contemplated by the classification. . . . The underwriting guide . . . links particular businesses to appropriate classifications." (Adjudication at 31.) Thus, the business processes of an enterprise in question may be analogized to a classification by comparing the business processes involved in the enterprise and the business processes included in a classification's definition and underwriting examples.

In seeking an analogous classification for the BHRS and AAWS programs, the Commissioner considered Code 951, determined by the PCRB to be the applicable classification, and Codes 941, 942, 943,[12] suggested by Laundry Owners. The Commissioner determined that the business processes involved in the BHRS and AAWS programs include the provision of behavioral modification and mentoring in the client's community, home, or school during daytime hours, as well as job coaching to adults with autism. (Adjudication at 33.) This determination is supported by the record. (Letter from Touch–Stone to PCRB (October 27, 2011) at 3–5, R.R. at 51a–53a.) Looking to the Manual's description of Code 951, the Commissioner observed that the business processes common to this classification's underwriting examples included travel and interaction with individuals and small groups in the community, businesses, and homes. (Adjudication at 37.) The Manual supports this conclusion. Underwriting examples included under Code 951 encompass non-sales positions such as insurance auditor, boiler inspection, meter reader, elevator inspection, messenger, newspaper reporter, and tour guide. (Manual, Classifications, § 2 at A94, Code 951.) The business processes in common to all these underwriting examples are travel and interaction with the public.

The Commissioner determined that Code 941 includes some of the same business processes as the BHRS and AAWS programs, but also includes maintaining a residential facility and providing home living services. (Adjudication at 34.) Again, this determination is supported by the Manual, whose definition of Code 941 states that it is applicable to non-medical residential care facilities. (Manual, Classifications, § 2 at A91, Code 941.) All of the underwriting examples, such as Communi-

12. Before the Commissioner, Laundry Owners also argued that Code 976 (Y.M.C.A., Y.W.C.A.) was analogous to the BHRS and AAWS programs. However, Laundry Owners does not maintain this argument on appeal and, thus, we will omit discussion of Code 976 from our analysis.

ty Residential Facility, Family Living Home For the Developmentally Disabled, and Residential Child Care Service, include residential facilities. (Manual, Classifications, § 2 at A91, Code 941.) The Commissioner determined that Codes 942 and 943 include:

" . . . skilled services under a physician's written direction that include but are not necessarily limited to nursing care, home infusion therapy, physical, speech, and/or occupational therapy and/or non-professional services, including but not necessarily limited to home health aide, attendant care, companions and live-ins and/or home support services such as homemakers or chore workers."

(Adjudication at 34 (quoting Manual, Classifications, § 2 at A123).) The Commissioner aptly noted that these processes generally involve physical treatment of a client.

Comparing the business processes involved in the BHRS and AAWS programs to those culled from the definitions and underwriting examples of the proposed classifications, the Commissioner determined that Code 951 was most analogous in terms of its business processes. As noted by the Commissioner, although Code 951 does not include some of the specific business processes performed by BHRS and AAWS employees such as care or mentoring of mentally challenged individuals, it does share important business processes with the BHRS and AAWS programs, including travel and interaction with individuals or small groups in various settings. (Adjudication at 37.) We see no error or abuse of discretion in the Commissioner's very thorough analysis of the other proposed classifications. As pointed out by the Commissioner, Code 941 involves the business process of maintaining a residential facility, which is not involved in the BHRS and AAWS programs. Likewise, the business processes of Codes 942

and 943 involve a level of physical interaction with clients that is not present in the BHRS and AAWS programs. Thus, of the classifications before the Commissioner, Codes 941, 942, 943, and 951, it appears that Code 951 is the only classification that shares major business processes in common with the BHRS and AAWS programs, such as travel and interaction with the public or clients in community settings and private homes, but does not include major business processes foreign to the BHRS and AAWS programs, such as operation of a residential facility or physical interaction with clients. Therefore, recognizing the complex statutory scheme and the Commissioner's expertise, *Grimaud,* 995 A.2d at 400 n. 8, we cannot say that the Commissioner erred or abused his discretion in determining that Code 951 was the most analogous classification in terms of business processes for the BHRS and AAWS programs.

Turning to the question of which classification is most analogous to the BHRS and AAWS programs in terms of hazard, there were no facts in the stipulation and Laundry Owners did not adduce any evidence that would have enabled the Commissioner to analogize the hazards inherent in the BHRS and AAWS programs. There were no stipulated facts or evidence in the record regarding the hazards experienced by BHRS or AAWS employees in their work, nor is there any empirical evidence of Workers' Compensation costs incurred by the BHRS and AAWS programs or other similar businesses. The Commissioner attempted to compare the hazards of the BHRS and AAWS programs with proposed classifications by comparing the cost rates associated with proposed classifications and other similar classifications. The Manual does not describe the nature of hazards inherent in a given classification. Instead, the Manual provides quantitative ratings of risk in the form of a "Loss Cost"

and relative hazard grouping for each classification.[13] (*See* Manual, Rating Values, § 2 at 2 (table of loss costs and expected loss factors).) This information allows the different classifications to be compared to each other by comparing their respective Loss Costs. Assignment of employees to a classification with higher loss costs would generate more premium income to an insurer than would be generated by assignment of employees to a classification with lower loss costs. Laundry Owners, however, did not provide any quantitative information regarding the workers' compensation losses experienced by the BHRS and AAWS programs that would allow for a comparison between the losses actually experienced by these programs and the losses expected by a given classification. Without such information this Court has no concrete basis upon which to conclude that the Commissioner erred or abused his discretion in analogizing the risks inherent in the BHRS and AAWS programs to the hazards of the proposed classifications. Thus, Laundry Owners failed to carry its burden of showing that the hazards inherent in the BHRS and AAWS programs are not analogous to the hazards inherent in Code 951 businesses.

Finally, before this Court, Laundry Owners argues that we should also consider whether Code 892 is analogous to the BHRS and AAWS programs. Laundry Owners did not raise the classification in Code 892, involving early intervention, before the Commissioner and, therefore, he did not have an opportunity to consider it. Thus, although it appears this classification, which involves the provision of social services, including work with cognition, communication, and socialization, in a child's home or daycare, might be analogous to the services provided by the BHRS and AAWS programs, we cannot, unfortunately, review this on appeal because to do so would require us to substitute our judgment for the Commissioner's. *See Graduate Health Systems*, 674 A.2d at 374 ("We reiterate that this court must be especially cautious in substituting its discretion for the expertise of an administrative agency where the statutory scheme is complex."). Laundry Owners needed to present this classification below for the Commissioner's consideration.

For these reasons, we affirm the Order of the Commissioner.

Judge LEADBETTER did not participate in the decision in this case.

### ORDER

**NOW**, May 20, 2014, the Order of the Insurance Commissioner of the Commonwealth of Pennsylvania in the above-captioned matter is hereby **AFFIRMED**.

---

**13.** The "Loss Cost" is the cost of insurance per $100.00 of payroll of the covered employer. (Adjudication at 32 n. 10.) The "Loss Cost" "generally correlates with the hazard associated with the classification for comparison purposes." (Adjudication at 32 n. 10.)